Gerald W. BIVINS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 06S00–9105–DP–00401.

Supreme Court of Indiana.

Nov. 4, 1994.

As Amended March 9, 1995.

Susan K. Carpenter, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

## ON DIRECT APPEAL

DICKSON, Justice.

The defendant, Gerald W. Bivins, was convicted following jury trial of six crimes committed during a two-day central Indiana crime spree in January of 1991. As a result, he was sentenced to death for the murder of William Harvey Radcliffe and consecutive terms of twenty years for one count of robbery, twenty years for one count of confinement, three years for one count of auto theft, and three years for each of two counts of theft. His direct appeal to this Court presents various issues which we regroup and address as follows: 1) physical restraint at trial; 2) admissibility of defendant's statements; 3) loss or destruction of evidence; 4) evidence and instruction regarding escape; 5) merger of offenses; 6) constitutionality of Indiana's death penalty statute; 7) death penalty aggravator as double jeopardy; 8) penalty phase instructions; 9) failure to find and weigh mitigators; 10) use of non-statutory aggravators including victim impact evidence; and 11) nature of relief to be afforded. Although we find that Count IV of the information, charging money and bank card theft, is merged with Count I, charging robbery, we affirm the remaining convictions and conclude that a sentence of death is proper and appropriate.

A summary of the evidence begins with the evening of January 16, 1991, when the defendant and two other men, Ronald Chambers and Scott Weyls, stopped at a Lazarus Department Store in Lafayette, Indiana, where the defendant stole blue jeans. The men avoided apprehension by pointing a gun at a security guard. After two intervening stops, the three men drove to a Holiday Inn in Lebanon, Indiana, where the defendant and Chambers forced their way into a guest room occupied by Kevin Hritzkowin. The defendant and Chambers pointed their guns at Hritzkowin's head and body; ransacked his room; took his cash, credit card, and van keys; threatened to kill him; struck him on the back of his head; and tied him to a bathtub railing. The defendant then drove from the Holiday Inn in Hritzkowin's van, shortly thereafter parking the van and rejoining Chambers and Weyls in the defendant's wife's car. The three men then headed back toward Lafayette and stopped at an interstate highway rest area just north of Lebanon. There, the defendant and Chambers confronted Reverend William Radcliffe in the public restroom and announced a robbery with their guns drawn. Reverend Radcliffe cooperated immediately, giving the men his wallet. The defendant turned Radcliffe around, pushed him into a stall, and fatally shot him in the head. As they were fleeing the rest area, the defendant told Chambers that he had shot Radcliffe because he wanted to know what it felt like to kill. The next day, he also reiterated this to Weyls.

During the ensuing days, the defendant attempted to conceal his role in the crimes. He burned the shoes he had worn, believing them to be blood-stained. He had the inside of his wife's car cleaned. He discarded the fruits of his robberies in a dumpster near his home and threw the gun and the car's license plate into a creek.

### 1. Physical Restraint of Defendant at Trial

■ The defendant contends that his rights to the presumption of innocence and to a fair trial were violated by his being required to appear at trial in physical restraints. He also argues that the trial court's emphasis on the seriousness of the charges should not constitute valid grounds for the shackling, because this would allow a trial judge to deny a defendant's constitutional rights whenever the charges are serious.

In light of his previous escape, escape attempts, and comments about future escapes, the State moved that the defendant be physically restrained during trial. At the hearing on the State's motion, evidence was presented that the defendant had previously escaped from custody on March 26, 1991, while the

sheriff had the defendant out of jail for investigatory purposes. The sheriff believed that the defendant was a speedy runner and considered him an escape risk. The defendant had also made a remark to a jail guard regarding the possibility of jumping through a third-story courtroom window. Arguing that he had not attempted to escape from pre-trial hearings and that three to four officers would be in the courtroom at all times, the defendant objected to the motion.

■ The trial court granted the State's request, ordering that the defendant be shackled in leg irons during the trial. The prosecutor informed the court that she planned to bring the defendant into the courtroom when the jury was not present and also agreed to the defendant's suggestion that screens be set up in front of the prosecution and defense tables to block the jury's view of both parties' feet.

In *Evans v. State* (1991), Ind., 571 N.E.2d 1231, this Court stated:

The general rule is that a criminal defendant is not to appear before the jury in bonds or shackles; however, certain exceptions exist which permit the trial court to use its discretion to have the defendant restrained when necessary to prevent his escape, to protect those present in the courtroom, and to maintain order during the trial.

*Id.* at 1238 (citing *Walker v. State* (1980), 274 Ind. 224, 229, 410 N.E.2d 1190, 1193). Upon appellate review of an order to restrain the defendant, we consider whether the trial court abused its discretion. *Evans,* 571 N.E.2d at 1238.

The defendant does not assert that the jury ever saw the shackles or had any awareness of his restraint. From this, together with the defendant's proclivities for escape, we find no abuse of discretion in the trial court's order that the defendant be shackled in leg irons during the course of the trial.

### 2. *Admissibility of Statements*

The defendant argues that his rights under the fifth, sixth, and fourteenth amendments of the U.S. Constitution and under Article 1, Section 13 of the Indiana Constitution [1] were violated by the admission of various statements made by the defendant. The defendant filed a motion to suppress all of these utterances, which was denied.

■ This Court has recently summarized applicable law on this issue as follows:

Statements made to police or to their agents by those in police custody in response to police interrogation are inadmissible at trial, unless the State sustains its burden to prove beyond a reasonable doubt, that they were preceded by a knowing and voluntary waiver of the privilege against self-incrimination and the right to counsel and were themselves voluntarily given. In determining whether a statement or waiver was voluntarily given, we look to all the circumstances surrounding its giving to determine whether it was the product of any violence, threats, promises, or other improper influence. The appropriate standard for evaluating the voluntariness of a waiver of rights is the totality of the circumstances test.

*Johnson v. State* (1992), Ind., 584 N.E.2d 1092, 1098–99, (citations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 155, 121 L.Ed.2d 105. Furthermore,

[a] review of voluntariness of statements made during a custodial interrogation involves looking at all the evidence. Among the considerations are the defendant's low level of intelligence, inconsistencies in the defendant's statement, explicit or implicit promises by police interrogators, and the coercive nature of the interrogation atmosphere.

*Light,* 547 N.E.2d at 1077 (citations omitted). Accordingly, a signed waiver "is not conclusive evidence of a knowing, intelligent and voluntary waiver." *Houchin v. State* (1991), Ind., 581 N.E.2d 1228, 1231.

---

**1.** Because of the failure to present legal analysis to support his assertion of violation of the Indiana Constitution, the defendant has waived the state constitutional argument. *Light v. State* (1989), Ind., 547 N.E.2d 1073, 1076 n. 1 (citing *St. John v. State* (1988), Ind., 523 N.E.2d 1353 (failure to provide argument for independent standard waives state constitutional law issue)).

Applying these standards, we now turn to an analysis of each of the questioned statements.

### a. *February 20, 1991, Statement*

■ Following the events of January 16, 1991, the defendant was arrested on February 20, 1991, in Lafayette on an unrelated Carroll County forgery charge. The defendant was read a standard advice of rights form and a waiver of rights form, both of which he signed. He did not ask and was not told whether he would be questioned about any crimes other than the forgery charge. Following the taking of a recorded statement regarding the forgery, the defendant was asked if he had any knowledge regarding other crimes, including the robberies and murder in Boone and Tippecanoe counties on January 16. The defendant offered to provide information about the caliber of gun used to kill the minister, the precise location of the murder, and various other crimes, including a Lazarus shoplifting.

The defendant argued at trial that the advisements only covered the questioning about the Carroll County forgery charge and did not establish his waiver of rights to be questioned about the offenses in Tippecanoe and Boone counties. He asserts that he did not knowingly, intelligently, and voluntarily waive his right to silence in regard to those crimes and that the resulting evidence, part of the burnt tennis shoe and a photograph thereof, were erroneously admitted as evidence.

■ A suspect's awareness of all of the possible subjects of questioning in advance of interrogation "is not relevant to determining whether the suspect knowingly, voluntarily, and intelligently waived his Fifth Amendment privilege [against self-incrimination]." *Colorado v. Spring* (1987), 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954, 968. We also note that the advice of rights and waiver forms read to and signed by the defendant specifically advised him that even if he decided to answer questions immediately without a lawyer present, he still had the right to stop answering at any time.

Reviewing the circumstances surrounding the waiver and the ensuing statements by the defendant, we find that his conduct was not the product of any violence, threats, promises, or other improper influence. The trial court did not err in overruling the defendant's objections to evidence resulting from the February 20, 1991, statement following his arrest on the Carroll County charges.

### b. *February 21, 1991, Discarded Gun Search*

■ On the day after his arrest, February 21, 1991, the defendant was taken from the Carroll County Jail to various locations in Tippecanoe County so that the defendant could show police investigators where evidence from the crimes of January 16, 1991, had been discarded. Detective Brown testified that he did not readvise the defendant of his *Miranda* rights before going on the search because the excursion was "a continuation of the interview from the night before." Record at 3438–42. The detective believed that since the police were not asking the defendant any new questions or taking a formal statement, but merely having the defendant show them the location of the gun discussed the night before, it was not necessary to readvise the defendant of his rights. The police and the defendant looked for the gun but were unable to find it. One week thereafter, however, a gun, later determined to be the murder weapon, was found at the location identified by the defendant.

At trial, the defendant objected to the admission of any testimony about what he told police on February 21 and the resulting evidence on the grounds that he had been in police custody and had been subjected to questioning without being advised of and waiving his *Miranda* rights. On appeal, he argues that we apply the following standard of review:

We have held that if at the commencement of custodial interrogation the suspect has been given an advisement and made a waiver in accordance with the guidelines in *Miranda*, that advisement need not be repeated so long as the circumstances attending any interruption or adjournment of the process is such that the suspect has

not been deprived of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogation, including the right to cut off questioning.

*Partlow v. State* (1983), Ind., 453 N.E.2d 259, 269 (citation omitted), *cert. denied,* (1984), 464 U.S. 1072, 104 S.Ct. 983, 79 L.Ed.2d 219. The defendant urges that the relationship and passage of time between the initial reading of rights and the subsequent search for physical evidence the next day were too tenuous and too great, respectively, and deprived the defendant of the opportunity to make an informed and voluntary waiver of his rights. The State responds that because the defendant had told police the night before that he could show them where the gun was, the intervening time prior to the next day's search was not such that Defendant was deprived of the opportunity to make an informed and intelligent assessment of his interests. We agree.

The daylight resumption of the prior night's search for items named that same evening by the defendant did not require a renewed advisement of rights. The trial court did not err in overruling the defendant's objections to the evidence resulting from the February 21 search.

#### c. *February 25, 1991, Statements in Tippecanoe County*

Later on February 21, 1991, in Lafayette, the police taped a statement from the defendant after he was readvised of his *Miranda* rights. The defendant stated that he had helped two men, Jamie Warren and Kevin Robertson, attempt to use stolen credit cards and dispose of some stolen property. Claiming that Warren and Robertson had confided the particulars of their crimes to the defendant, the defendant related in great detail the stories of the robberies and the Radcliffe murder.[2] By February 25, 1991, however, the police had established that neither Warren nor Robertson could have committed the murder.

On February 25, the defendant was questioned by an Indiana State Police sergeant in

Lafayette. During a polygraph test that followed an additional *Miranda* advisement and the signing of a polygraph waiver form, the defendant told the sergeant that he had not told the truth about who committed the murder and the robberies. In the presence of Boone County Sheriff Ern K. Hudson, the defendant claimed to be afraid of the two people whom he alleged had committed the crimes. After admitting that he had been at the rest stop the night the minister had been killed, the defendant said that if he had to do time, he did not want to be imprisoned at the same facility as the two who actually committed the crime. He then said he wished to cooperate and requested the opportunity to speak with a prosecutor. Upon the defendant's request for the sheriff's suggestions, Hudson advised him that in view of his willingness to cooperate, the sheriff would call ahead from Lafayette to Lebanon and arrange for the appointment of a defense attorney. The defendant responded, "I don't want an attorney to tell me to keep my mouth shut, all I want an attorney for is to negotiate with [Boone County Prosecutor Rebecca McClure]." Record at 3277. Sheriff Hudson also provided the following testimony regarding the subsequent dialogue between himself and the defendant:

> [Sheriff Hudson] I told Mr. Bivins that I had called the Prosecutor and that she was in the process of getting the Judge to appoint an attorney. That we would be leaving immediately and drive to the jail where he would have an opportunity to meet with the attorney. And the only statement that I made to him was that I would like to know who those two guys are.
>
> [Prosecutor McClure] Did Mr. Bivins say anything further to you before you left the post?
>
> [Sheriff Hudson] Yes, he did.
>
> [Prosecutor McClure] And what was that?
>
> [Sheriff Hudson] Well, then he first said that he wanted to talk to you. And I said, "That is fine, we're going to be en route

---

2. On February 22, 1991, the defendant testified at a probable cause hearing for the arrest of

Warren and Robertson for the murder and robberies of January 16, 1991.

right now." And he then said, "Are you sure that you're going to keep your word and that you're not lying to me, you're really getting an attorney for me?" And I said, "Absolutely, for sure." And that, "You can take my word on that. We're going to leave here and we're going to get you an attorney." And I again made a statement, "I'd like to know who those two guys were that were with you." And then he said, "Well, I want to meet with this attorney to negotiate." And I said, "Fine. That's where we're going right now. But I would still like to know who those two guys are." And then he mentioned one of the two other individuals' names at that time.

[Prosecutor McClure] And who was that?

[Sheriff Hudson] That was Scott Weyls.

\* \* \* \* \* \*

[Sheriff Hudson] As we were out in the hallway area getting ready to exit the building on our way to the parking lot, Mr. Bivins stated who the other or the second individual that was with him during the night of this crime spree.

[Prosecutor McClure] And who was that?

[Sheriff Hudson] Ronald Chambers.

Record at 3278–80.

■ In relation to this sequence of events, the defendant makes two claims. The first relates to the fact that during the period of questioning at the State Police Post, different detectives, sergeants, and a sheriff initiated and concluded questioning. Under *Partlow,* discussed *supra,* the *Miranda* rights "need not be repeated so long as the circumstances attending any interruption or adjournment of the process [are] such that the suspect has not been deprived of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogation, including his right to cut off questioning." *Partlow,* 453 N.E.2d at 269 (quoting *Owens v. State* (1982), Ind., 431 N.E.2d 108, 110). The defendant argues that the circumstances and purposes of the interrogation changed each time various officers left the room and were replaced by others and that a new advisement of rights and waiver were required before he could knowingly and intelligently waive his rights with regard to the

new periods of interrogation that began after each of two such changes.

■ This interrogation sequence did not require new advisements of rights. A defendant is considered to have waived his right to counsel at questioning following a polygraph examination "unless the circumstances have changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." *Wyrick v. Fields* (1982), 459 U.S. 42, 47, 103 S.Ct. 394, 396, 74 L.Ed.2d 214, 218. The circumstances in the present case are akin to those in *Wyrick,* where the Court noted that "the questions put to [the defendant] after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before." *Id.* at 49, 103 S.Ct. at 397, 74 L.Ed.2d at 219. The defendant has not demonstrated changes in circumstances indicating that his answers ceased to be voluntary.

■ The defendant further argues that the trial court should have excluded from evidence his statements to Sheriff Hudson after Hudson arranged to have an attorney appointed for the defendant. Even if we were to assume that the defendant did not initiate the conversations following his request for an attorney and that the sheriff's communications were thus impermissible, the admission into evidence of defendant's disclosure of the names of Weyls and Chambers would constitute harmless error. The defendant had already acknowledged his involvement in the robberies and murder and the existence of two other participants. Furnishing the names of the two scarcely incriminated the defendant more than he had already incriminated himself. The defendant has failed to demonstrate how the admission of this statement further inculpated him or otherwise worked to his detriment. In addition, as discussed *infra,* the defendant again gave the names of Weyls and Chambers under proper interrogation and statement-making procedures to Prosecutor McClure. *See Schwartzkopf v. State* (1989), Ind., 539 N.E.2d 953 (receiving defendant's confession into evidence was harmless error where de-

fendant later related the same facts to another).

### d. February 25, 1991, Statements in Boone County

█ The defendant contends that the trial court erred in permitting the State to place into evidence the defendant's recorded statement of February 25, asserting that it was involuntary because made under an unkept promise of leniency.

█ After being transported from the Indiana State Police Post in Lafayette to the Boone County Jail, the defendant was allowed to consult with attorney Michael Gross, who had been appointed to represent him. The inculpatory portion of the recorded statement was preceded with the following express and recorded acknowledgement by the defendant:

The above statement of my rights has been read to me and I am fully aware of those rights. I do fully understand those rights. I hereby acknowledge that I have, I at one time requested a lawyer and now have an attorney present. I further acknowledge that I have initiated this interview and that I have requested to make a statement. I am willing to make a statement and answer questions. This waiver of my rights has been knowingly and voluntarily made by me without any promises or threats having been made to me and further without any pressure or coercion having been used against me.

Record at 3566–67. Thereafter, the recorded interview contains the following statement by the prosecutor:

And I would first specify that this agreement is being entered into after Mr. Bivins has already confessed in a non-recorded or non-recorded [sic] confession, which took place earlier this evening. And this agreement is being, has been negotiated only after that admission was made. In exchange for the cooperation of Mr. Bivins,

and like I said, his agreement to cooperate fully in the prosecution of this case and providing truthful information relating to both a robbery at the Holiday Inn which occurred on January 16, 1991, here in Lebanon, Boone County, and also to a murder that occurred at a rest stop on I–65, north, here in Boone County, Indiana, that:

Mr. Bivins will be charged with robbery as a Class B felony as it relates to the Holiday Inn in Lebanon.

That he will plead guilty straight up. In other words, that he will plead guilty with both defense and the State reserving the right to argue sentencing.

* * * I, the Prosecutor, will talk if at all possible tomorrow with the Prosecutors in both Tippecanoe and Carroll County. I can do no more than represent that I will ask that they run concurrent any time for charges that Mr. Bivins may face there, which I understand to relate to forgeries in both of those counties. That's the agreement as I understand it to be.

Record at 3568–69. The recorded statement later includes the defendant's statement that he participated in the Holiday Inn robbery, that he was at the interstate highway rest stop but outside the restroom when Reverend Radcliffe was murdered, and that it was Weyls who actually shot Radcliffe. In this appeal, the defendant contends that the State made an offer of immunity and leniency "to obtain Bivins' confession to having been a participant in the murder of Reverend Radcliffe." Brief of Appellant at 105.[3] He contends that the confession must be deemed involuntary and therefore not admissible because it was obtained by promises of immunity or mitigation of punishment.

█ In resolving this issue, the relevant inquiry is whether the State's promise "induced a confession which was not freely self-determined." *Fowler v. State* (1985), Ind., 483 N.E.2d 739, 744 *quoted with approval in Drew v. State* (1987), Ind., 503

---

**3.** In this appeal, the defendant does not seek to enforce the alleged promise of immunity and leniency, but rather seeks to exclude the ensuing statements. The State may not refuse to honor an agreement to abate criminal proceedings against a suspect after the suspect has fully performed his obligation under the agreement. *Bowers v. State* (1986), Ind., 500 N.E.2d 203. However, the defendant's misrepresentation as to the extent of his actual participation in the murder relieves the State of its offer of leniency.

N.E.2d 613, 617. The trial court must determine whether the State's behavior "was such as to overbear the defendant's will to resist and to bring about a confession not freely self-determined." *Smith v. State* (1989), Ind., 543 N.E.2d 634, 637. On appeal, we consider any uncontroverted evidence and, in the case of conflicting evidence, that which supports the trial court's decision. *Id.* Further, where a promise of immunity or leniency was not initiated by the State but rather solicited by a defendant as a precondition for making a statement, a defendant manifests the propensity and willingness to make a freely self-determined, voluntary statement not induced by prosecutorial misconduct. *Drew*, 503 N.E.2d at 617. Where a promise of leniency results from a defendant's specific request for it as a precondition for making a statement, rather than being initiated by the State, its voluntariness is not impaired thereby. *Collins v. State* (1987), Ind., 509 N.E.2d 827, 830; *Drew*, 503 N.E.2d at 617.

We find that this statement by the defendant was voluntary. The State's offer of leniency was precipitated by the defendant's specific request. It was the defendant who sought contact with the prosecutor. As in *Drew*, the defendant had already manifested a propensity and willingness to make a voluntary statement before the State offered leniency. Thus, the defendant's resulting statement was freely determined and not induced by State action.

### e. *March 28, 1991, Statement*

The defendant next argues that his statement of March 28, 1991, was not accompanied by a knowing and voluntary waiver of his right to counsel and therefore is inadmissible. On that date, the defendant asked to talk with Sheriff Hudson, who then read to him an advisement of rights form containing the statements "I at one time requested a lawyer, but now I wish to WAIVE that RIGHT" and "I have INITIATED this interview." Record at 3288. The defendant signed this waiver form. He then, for the first time, told the sheriff not only that had he had been at the rest area during the murder, but also that he had been inside the restroom at the time of the murder. The

defendant now contends that his Sixth Amendment right to counsel was violated because he already had an attorney, his attorney was not notified, and he was not advised that his attorney would not be present.

Although a defendant may waive a previously invoked right to counsel by initiating conversations or discussions with authorities, *Weaver v. State* (1991), Ind., 583 N.E.2d 136, 140, initiation of dialogue with police does not automatically constitute a waiver of such right. *Phillips v. State* (1986), Ind., 492 N.E.2d 10, 16. The waiver determination is made by reviewing the totality of circumstances, including the accused's initiation of the dialogue, to determine whether the defendant made a knowing and intelligent relinquishment or abandonment of a known right or privilege. *Id.* Applying these standards, we find no Sixth Amendment violation. Not only did the defendant initiate the conversation, but he also expressly acknowledged his prior request for counsel and his choice to waive that right. The totality of the circumstances convinces us that the defendant's waiver was a knowing, intelligent, and voluntary relinquishment of his right to counsel.

### f. *April 10, 1991, Confession*

The defendant claims reversible error occurred with the admission of testimony describing his confession of April 10, 1991. On that date the defendant again initiated an interview, requesting from his jail cell to speak with a detective with whom he had been dealing, saying he wanted to confess to killing Reverend Radcliffe. The detective was called and arrived with a second detective about thirty minutes later. A tape recording was made of the detective reading the defendant his rights and the defendant orally reading the waiver section. The defendant then gestured for the detectives to turn off the tape recorder, which they did. The defendant indicated he wanted to make a complete disclosure and then admitted that it was he, not Weyls, who shot Reverend Radcliffe. The tape recording of the defendant's waiver of rights was not saved by police.

The defendant acknowledges that the applicable standard for a voluntary con-

fession is whether, looking at all the circumstances, the confession was free and voluntary, not induced by any violence, threats, promises, or other improper influences. *Armour v. State* (1985), Ind., 479 N.E.2d 1294, 1298. His argument emphasizes the failure of police to notify his attorney, the failure to retain the tape recording, and his testimony that he felt deprived of the opportunity to visit with his family. From our review of the Record, we conclude that the evidence was sufficient to support the trial court's determination that the State had proven beyond a reasonable doubt that the waiver and statement were given voluntarily and were not the product of any violence, threats, promises, or other improper influences.

#### g. April 11, 1991, Statement

██ The defendant finally objects to admission of his statement of April 11 confirming the truth of his statement to Detective Brown the previous night. He again argues that he was not re-advised of his *Miranda* rights.

In this incident, the defendant asked to speak with the sheriff, who went to the defendant's cell and said, "You wanted to see me." *Id.* The defendant responded, "I just wanted you to know that what I told him last night was the truth." Record at 3660.

We do not find the sheriff's response to the defendant's request to constitute an interrogation. The defendant's remarks were made freely, voluntarily, and spontaneously, and not in response to questioning. The sheriff was not required to give a new *Miranda* warning. *See Hopkins v. State* (1991), Ind., 582 N.E.2d 345, 349, *reh'g denied. See also Robey v. State* (1990), Ind., 555 N.E.2d 145, 148.

> Not every statement uttered by a police officer which is punctuated with a question mark will necessarily constitute an interrogation. Rather it is necessary to view the statement in the context in which it was made. If, after having done so, it does not appear that the purpose of the remark was to obtain a confession from the accused,

> Miranda is not triggered and it is not necessary that the accused first be advised of his rights.

*Hopkins,* 582 N.E.2d at 349 (quoting *Johnson v. State* (1978), 269 Ind. 370, 377, 380 N.E.2d 1236, 1240).

#### 3. Loss or Destruction of Evidence

The defendant contends that the State's loss or destruction of material evidence impaired his rights to a fair trial and due process of law under the fifth and fourteenth amendments to the United States Constitution and Article I, Section 12 of the Indiana Constitution.[4]

Prior to trial, the defendant moved to dismiss the death penalty charge against him, alleging that the State had either lost or destroyed the audio tape recordings allegedly made during the February 25, 1991, interrogation at the Indiana State Police Post in Lafayette and of the April 10, 1991, advice and waiver of rights preceding interrogation. The trial court denied this motion, and the defendant timely reasserted his objections during the presentation of evidence at trial.

The Record establishes that on February 25, 1991, the defendant was being interrogated in a polygraph room at the Lafayette State Police Post while other officers were listening over a speaker system in a "listening room." Citing the testimony of Sergeant James, the State contends that the record is devoid of evidence that tape recordings were made of the February 25, 1991, statements. The State contends that in order for people in the listening room to hear what was going on in the polygraph room, a tape cassette had to be placed in a recorder in the listening room so that sound from the polygraph room could be transmitted to the recorder's speakers. However, the device did not actually have to be recording to effect transmission if the pause button were pushed. Record at 3209–10, 3215–16.

Sergeant James testified that he did place a tape cassette into the recorder. Although stating that he "believed" that the conversation was recorded, James consistently emphasized that he lacked actual knowledge of

---

4. The State constitutional claim is waived for failure to present supporting argument.

that fact because, after inserting the tape cassette, he left the room. Record at 3197-98, 3206, 3207. Sheriff Hudson testified that the tape cassette was repeatedly turned over and reused "to keep the listening device going" and that "whatever was on it would be recorded over." Record at 772. However, Sheriff Hudson testified at the suppression hearing that the State Police or the Tippecanoe County Sheriff gave him "a couple of tapes" following the listening session but that he never listened to the tapes and did not know of their whereabouts thereafter. Record at 773.

On April 10, 1991, at the Tippecanoe County Jail, the defendant summoned a detective to confess to the killing of the minister. The detective turned on the tape recorder and read the defendant his rights. The defendant then signed a waiver form, gestured for the tape recorder to be turned off, and proceeded to make unrecorded inculpatory remarks. The detective testified that he had not kept the tape and probably had reused it. The defendant claims that tapes from this session would have revealed that he felt he was pressured by the possibility of missing a family visit and, accordingly, that any statement he made at that time might not be voluntary.

The defendant concedes that under *Arizona v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281, the failure to preserve potentially useful evidence does not constitute a denial of due process of law "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289. He argues that he has established that the police acted in bad faith, further urging that Indiana case law provides:

> [T]he negligent destruction or withholding of material evidence by police or prosecution may present grounds for reversal. The defendant must establish materiality as a condition precedent to claiming a denial of due process where evidence is negligently lost or withheld by the government except where the materiality is self evident or a showing of materiality is prevented by the destruction of the evidence.

Brief of Appellant at 116 (quoting *Lee v. State* (1989), Ind., 545 N.E.2d 1085, 1089). In *Lee,* this Court did not hold that materiality was the sole determinant in a claim of negligently lost or withheld evidence. Rather, as a "condition precedent," a showing of materiality must be made before the courts are required to address the principal issue of whether there was bad faith on the part of the police.

■ The defendant argues that the materiality of the tapes of February 25, 1991, lies in their ability to establish whether the defendant asked for an attorney before he made any incriminating admissions. According to four other officers, the defendant made the incriminating remarks before he requested an attorney. The defendant argues that the tapes are material in resolving this dispute which would in turn determine whether the incriminating statements were properly admitted as evidence against the defendant.

The trial court found that the disputed contents of the February 25 conversation would have been definitively answered if the conversation had been tape-recorded and the recording retained. The court further found that the absence of the tapes "creates a credibility issue" but "is not fatal to the State's ability to maintain the death penalty request." Record at 95. Because it has not been established that the tape recordings ever existed, there is no showing that the police necessarily lost or destroyed material evidence.

■ The defendant asserts that the materiality of the April 10, 1991, advisement of rights tape is its ability to prove that the defendant waived his rights under coercion and duress, as the defendant expected to have visitation with his family in Carroll County before he was unexpectedly transferred to Tippecanoe County. The defendant claims that he told the police, before they turned off the recorder, that he felt that he was under pressure, being moved from county to county without seeing his family. The preliminary advisements to the April 10 statement clearly were recorded by police before the tape was subsequently lost or reused. We agree that the recording would have provided material evidence. However,

the defendant has failed to demonstrate bad faith on the part of the police in failing to preserve the tape. We reject the defendant's argument that police bad faith is established merely by showing a high improbability that the police misplaced evidence in good faith.

We find no error on this issue.

### 4. Escape Evidence and Instruction

■ The defendant contends that his right to a fair trial was impaired both by the admission of evidence concerning an escape from custody and by the giving of an escape instruction.

As previously discussed, the defendant was initially arrested on an unrelated Carroll County forgery charge. Ensuing police questioning resulted in the defendant's disclosure of evidence linking him to the murder of Reverend Radcliffe, and the defendant was taken from jail to lead detectives to the location where the murder weapon had been discarded. During this investigatory trip, the defendant escaped. He initially avoided capture but was ultimately returned to jail.

Emphasizing that the escape occurred before he was charged with murder and during the time he was being held only on the forgery charge, the defendant argues that the escape evidence was not relevant and did not demonstrate a consciousness of guilt with respect to the charges at issue. He likewise asserts that the escape instruction was not supported by probative evidence.

We find that the escape evidence was relevant and admissible. At the time of his escape, the defendant had offered to provide police with information regarding the caliber of the gun used to kill Reverend Radcliffe, the precise location of the murder, and the location of the murder weapon. The defendant was obviously aware of his own involvement in the serious crimes thereafter formally charged. Such evidence is admissible, and its weight and probative force were matters for jury assessment and evaluation. *Lee v. State* (1982), Ind., 439 N.E.2d 603, 604. The trial court did not err in permitting evidence of the escape.

State's Instruction No. 5 stated that the defendant's escape from custody "while accused of the crime for which he is now being tried," is not evidence of guilt but is evidence of consciousness of guilt. Record at 325. The defendant argues that the instruction is not supported by the facts, because at the time of his escape he was not being held on the present charges. The defendant erroneously attempts to equate "accused of" with "charged with." We find that the instruction was supported by evidentiary facts or reasonable inferences that when he escaped, the defendant was aware of police suspicions, accusations, and imminent charges regarding his involvement in the subject crimes.

We reject the defendant's claims of error in the admission of the escape evidence and the instruction.

### 5. Merger of Offenses

Upon his convictions for the four crimes committed against Kevin Hritzkowin at the Lebanon Holiday Inn, the defendant was sentenced to consecutive terms aggregating forty-six years for robbery while armed with a deadly weapon, confinement with a deadly weapon, obtaining unauthorized control of a motor vehicle, and obtaining unauthorized control over property.

The defendant asserts three arguments in regard to the consecutive sentence. First, he asserts that his thefts of the personal property and the van of Hritzkowin must be merged into one offense under the single larceny rule. Next, he argues, the merged theft counts must in turn merge into the robbery count as a lesser included offense. Finally, he maintains that his use of a gun during these events cannot be used to elevate both the robbery and confinement counts to greater felonies.

■ Turning to the first argument, we note that the single larceny rule, long entrenched in Indiana law, provides that when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons, there is but a single "larceny," i.e., a single offense. *Raines v. State* (1987), Ind., 514 N.E.2d 298, 300. The rationale behind

this rule is that the taking of several articles at the same time from the same place is pursuant to a single intent and design. If only one offense is committed, there may be but one judgment and one sentence. *Id.* In *Stout v. State* (1985), Ind., 479 N.E.2d 563, we applied the rule to merge two counts of theft, one relating to several items of personal property taken from the victim's dwelling, and the other charging theft of an automobile from the victim's garage. We held that "[a] garage is a part of one's home." *Id.* at 568.

In the present case, Count IV charges the defendant with the theft of Hritzkowin's money and credit card, and Count III charges theft of Hritzkowin's automobile. Unlike the facts in *Stout,* however, the money and credit card were taken from Hritzkowin in his motel room and the automobile from the motel parking lot. We decline to deem the Holiday Inn parking lot to be a part of Hritzkowin's motel room. This conclusion is not altered by the defendant's claim that at the time he took Hritzkowin's money and credit card, he also took the keys to the victim's vehicle.

 The defendant next maintains that the counts of theft are lesser included offenses of the robbery count. The State concedes that the money and bank card theft charge may merge into the robbery count but seeks to distinguish the taking of the van because it was not taken from the victim's person and therefore could not be included in the definition of robbery. Ind.Code § 35–42–5–1. The State is correct.

 Finally, the defendant asserts that his convictions for robbery and confinement cannot both be aggravated to class B felonies by the same "use of a deadly weapon" aggravator, citing *Bevill v. State* (1985), Ind., 472 N.E.2d 1247. In *Bevill,* the stabbing of the victim was used to convict the defendant of attempted murder *and* to aggravate the burglary to a class A felony. This Court reversed, noting that "[t]here was only one quick and confined multiple stabbing." *Id.* at

1254. Unlike *Bevill,* however, the defendant here used a deadly weapon in more than one isolated circumstance. He made two separate uses of the weapon in committing two separate offenses. First, the defendant used his gun by pointing it at Hritzkowin's head in order to force him into the hotel room and to demand the victim's money and credit cards. The victim was further compelled to disclose and verify his bank card "PIN" number upon the threat of harm from a gun pressed behind his testicles. Secondly, when the defendant forced him into the bathroom of the hotel room and tied him to the handrail of the bathtub with telephone and electrical cords, the gun was put to Hritzkowin's head, and he was warned not to talk, make any sounds, or escape. Clearly, the defendant used his gun in multiple contexts and was correctly sentenced on elevated robbery and confinement charges. *See Flowers v. State* (1985), Ind., 481 N.E.2d 100, 106.

We conclude that Count IV, charging theft of money and bank card, merges with Count I, charging robbery, but otherwise decline to find error in the matters presented in this issue.

### 6. Constitutionality of Indiana's Death Penalty Statute

The defendant asserts multiple claims that the Indiana death penalty statute is unconstitutional on its face and as applied. He acknowledges that this Court has frequently upheld the statute against many similar claims, but he wishes to preserve these issues for federal review.

### a. Designation of Party with Burden of Proof in Weighing Process

 The defendant contends that Indiana Code Section 35–50–2–9(e)[5] is unclear as to whether the State must prove that the aggravating factor(s) outweigh the mitigating circumstance(s) or whether the defendant must prove the mitigating circumstance(s) outweigh the aggravating factor(s). Arguing

---

5. Our references to and discussion of the Indiana death penalty statute refer to it as it existed on July 9, 1992, the date of the defendant's sentencing. *See* Ind.Code Ann. § 35–50–2–9 (West 1992). The foregoing also applies to our discussion of the felony aggravator statutes and victim impact statutes. *See* Ind.Code Ann. § 35–38–1–8.5(a) (West 1992); Ind.Code Ann. § 35–38–1–9(b)(3), (c)(4) (West 1992); Ind.Code Ann. § 35–38–1–7.1(d) (West 1992).

that the statute can be easily interpreted to require the defendant to carry the burden of proof, the defendant asserts that the statute thereby shifts the burden of proof and violates the eighth and fourteenth amendments of the United States Constitution.

The statute provides in relevant part:

(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:

(1) that the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances exists; and

(2) that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation.

Ind.Code § 35–50–2–9(e). The determination of the weight to be accorded the aggravating and mitigating circumstances is not a "fact" which must be proved beyond a reasonable doubt but is a balancing process. *Daniels v. State* (1983), Ind., 453 N.E.2d 160, 171, *vacated on other grounds,* 491 U.S. 902, 109 S.Ct. 3182, 105 L.Ed.2d 691 (1989). The statute does not shift the factual burden of proof in violation of the eighth and fourteenth amendments.

### b. Designation of Standard of Proof to be Used in Weighing

 The defendant next contends that Indiana Code Section 35–50–2–9(e) fails to comply with the requirements of *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, because it does not require the State to prove that mitigators are outweighed by aggravators beyond a reasonable doubt.

This contention has been expressly rejected by this Court. *Fleenor v. State* (1987),

Ind., 514 N.E.2d 80, 92, *cert. denied,* (1988), 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158; *Moore v. State* (1985), Ind., 479 N.E.2d 1264, 1281 *cert. denied,* 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565; *Daniels,* 453 N.E.2d at 171.

### c. Consideration of Mercy

 Based upon his reading of *Woods v. State* (1989), Ind., 547 N.E.2d 772, 795, *reh'g granted,* (1990), 557 N.E.2d 1325, *cert. denied,* (1991), 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074, the defendant next contends that the death penalty statute does not allow the jury to consider mercy, contrary to the constitutions of both Indiana and the United States. His premise is not consistent with the language of the statute, which allows mitigating circumstances to include "[a]ny other circumstances appropriate for consideration." Ind.Code § 35–50–2–9(c)(8). Instead, the defendant mischaracterizes our decision in *Woods,* which did not preclude the consideration of mercy but rather affirmed the trial court's refusal to give an incorrect instruction. This instruction was contrary to the death penalty statute because it authorized the jury to be "governed by mere sentiment and sympathy." 547 N.E.2d at 785. The statute does not preclude consideration of mercy. The statutory language utilized is permissive, not compulsory, in stating that the jury *"may* recommend" the death penalty upon completion of the evaluation of aggravating and mitigating circumstances. Under Article 1, Section 19 of the Indiana Constitution, a jury in a criminal case "shall have the right to determine the law and the facts." Thus, a jury is not bound to convict even in the face of proof of guilt beyond a reasonable doubt. *Peck v. State* (1990), Ind., 563 N.E.2d 554, 560. However, it is improper for a court to instruct a jury that they have a right to disregard the law. *Beavers v. State* (1957), 236 Ind. 549, 560–61, 141 N.E.2d 118, 124–25. Notwithstanding Article 1, Section 19 of the Indiana Constitution, a jury has no more right to ignore the law than it has to ignore the facts in a case. *Id.* at 559, 141 N.E.2d 118.[6]

---

6. The defendant's claim is particularly questionable in the present case. Not only was Article 1,

Section 19 of the Indiana Constitution read to the jury in final instructions, but the jurors were

#### d. Mitigation Contentions

The defendant next contends that Indiana's death penalty statute is unconstitutional with respect to consideration of mitigating circumstances. In this regard, he presents three claims.

■ First, the defendant asserts that the statute permits juries to act with unguided discretion, in violation of *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, in those cases where a defendant is unable to prove "no significant history of prior criminal conduct," a statutory mitigating circumstance. Ind.Code § 35–50–2–9(c)(1). The defendant argues that a jury would necessarily infer the converse premise, that the defendant *does* have a significant criminal history, and that a jury would consider this an aggravating circumstance. The defendant presents no support for this claim. We find none and conclude that the Indiana statute is not defective in this regard.

■ The defendant next directs our attention to provisions in the statute which allow the jury to consider the fact that the defendant was "under the influence of *extreme* mental or emotional disturbance when the murder was committed" and that the "defendant's capacity to appreciate the criminality of the defendant's conduct or conform that conduct to the requirements of the law was *substantially* impaired as a result of mental disease or defect or of intoxication." Ind.Code § 35–50–2–9(c)(2), (c)(6) (emphasis added). He argues that this language prohibits consideration of less extreme emotional disturbances or less substantial impairments of a defendant's ability to appreciate the wrongfulness of the conduct and that such a prohibition violates *Eddings v. Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, and *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, which require that a capital jury must be allowed to consider all mitigating evidence. We disagree. A jury can consider as a miti-

gating circumstance "[a]ny other circumstance appropriate for consideration." Ind. Code § 35–50–2–9(c)(8).

Finally, the defendant asserts that this "catch-all" mitigator, subsection 9(c)(8), "dilutes the persuasiveness of a myriad of mitigating circumstances which may exist in a particular case." Brief of Appellant at 72. He provides no supporting authority, and we find no merit in this claim.

#### e. Unanimity Requirement for Aggravators

■ The defendant alleges that the death penalty statute is constitutionally infirm because it does not expressly require the jury to unanimously find the existence of an aggravating circumstance. The decisions of this Court have said otherwise. The death penalty statute requires that the jury may recommend the death penalty only if it unanimously finds beyond a reasonable doubt that at least one of the enumerated aggravating circumstances does exist. *Fleenor*, 514 N.E.2d at 91 (citing *Williams v. State* (1982), Ind., 430 N.E.2d 759, 765).

#### f. Unanimity Requirement for Mitigators

■ The defendant next asserts that the death penalty statute unconstitutionally fails to specify expressly that the jury can consider mitigating circumstances not unanimously found, contrary to *Mills v. Maryland* (1988), 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384. The *Mills* Court found that the jury instructions there prevented consideration of mitigating factors found by only some of the jurors and required the jury to return a verdict form identifying each mitigating factor unanimously found to exist. *Id.* at 399–400. However, Indiana procedure provides for jury consideration of any mitigating factor, enumerated or not, without reference to unanimity. Thus, the Indiana procedure does not run afoul of *Mills*.

further advised as follows: "In determining whether or not to recommend the death penalty in this cause, you should look to your own background, experience, beliefs and convictions, as well as your feelings concerning the death penalty, in deciding whether or not to recommend

such a sentence in this case. If, after examining your own background experience and beliefs concerning the death penalty, you feel that the death penalty should not be given to the defendant herein *for any reason*, you may elect not to." Record at 3933 (emphasis added).

### g. Jury as Judges of Law and Fact

■ The defendant next argues that Section 19 of the Indiana Constitution, which declares that in all criminal cases "the jury shall have the right to determine the law and the facts," renders the Indiana death penalty scheme violative of the eighth and fourteenth amendments of the United States Constitution. Without citation to compelling authority, he argues that Indiana juries are thus allowed to act with unguided discretion and that there is a distinct possibility that the death penalty may be imposed in an arbitrary and capricious manner.

Notwithstanding Article 1, Section 19, a jury must exercise the right to determine the law under the guidance of the trial court's instructions and may not disregard the law nor arbitrarily reject the instructions of the court. *Drake v. State* (1979), 272 Ind. 302, 304, 397 N.E.2d 600, 602; *Fuquay v. State* (1991), Ind.App., 583 N.E.2d 154, 156. We decline to find any constitutional infirmity created by the jury's statutory and constitutional option to recommend against the death penalty.

### h. Discretion of Prosecutor to Seek Death

■ The defendant claims that our death penalty statute is unconstitutional because the prosecuting attorney is given overbroad and unfettered discretion in seeking the death penalty.

This contention has been rejected repeatedly. *Coleman v. State* (1990), Ind., 558 N.E.2d 1059, 1065, *cert. denied* (1991), 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075; *Games v. State* (1989), Ind., 535 N.E.2d 530, 537, *cert. denied*, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158; *Fleenor*, 514 N.E.2d at 90. We decline to reconsider this issue.

### i. Meaningful Appellate Review

■ The defendant contends that the Indiana Death Penalty Statute violates the eighth and fourteenth amendments of the United States Constitution because of its failure to require this Court to conduct a death sentence review that will ensure that the sentence is not the result of wanton or arbitrary action.

The Indiana Constitution, Article 7, Section 4, empowers this Court to "exercise appellate jurisdiction" in death sentence appeals and grants us the power to "review and revise the sentence imposed." Indiana Code Section 35–50–2–9(h) prescribes that a death sentence is "subject to automatic review" by this Court but does not prescribe a standard of review. The Indiana Appellate Rules direct that, upon appellate consideration of sentences imposed on any criminal defendant, the reviewing court may only revise sentences found "manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind.Appellate Rule 17(B). Furthermore, the rules deem that a sentence "is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed." *Id.* In death penalty cases, however, these rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Cooper v. State* (1989), Ind., 540 N.E.2d 1216, 1218 (quoting *Spranger v. State* (1986), Ind., 498 N.E.2d 931, 947 n. 2, *cert. denied* (1987), 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536).

Thus, this Court automatically reviews every death sentence and applies a level of scrutiny more intensive than for other criminal penalties. *Woods*, 547 N.E.2d at 782. Our review "includes consideration of whether the procedure before the jury and the court by which the penalty has been imposed accords with the dictates of the sentencing statute, and whether the evidence renders the sentence appropriate." *Baird v. State* (1992), Ind., 604 N.E.2d 1170, 1181–82, *cert. denied*, —— U.S. ——, 114 S.Ct. 255, 126 L.Ed.2d 208. The process of appellate review for Indiana capital sentences fully comports with constitutional requirements seeking to prevent the arbitrary and capricious imposition of the death penalty. *See Fleenor*, 514 N.E.2d at 92.

We have repeatedly rejected the contention that Indiana's statutory death penalty procedure affords constitutionally inadequate appellate review. *Games*, 535 N.E.2d at 537; *Resnover v. State* (1984), Ind., 460 N.E.2d

922, 929–30, *cert. denied* (1984), 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160.

### j. Order of Closing Argument

■ The defendant observes that under Indiana law, the State makes "the first argument and the final closing argument to the jury at both the guilty phase of the trial and at the penalty phase of trial." Brief of Appellant at 76. Believing there to be an inherent advantage in presenting the final jury argument, the defendant argues this advantage must be given to the defendant in order to avoid a presumption in favor of death.

In light of the fact that the sequence of argument is statutorily prescribed because the State carries the burden of proof, and in light of our decision in *Evans v. State* (1990), Ind., 563 N.E.2d 1251, *reh'g granted on other grounds*, (1992), Ind., 598 N.E.2d 516, which rejected a similar claim, we are unpersuaded by this argument.

We find that none of these arguments, (a) through (i), individually or collectively, renders Indiana's death penalty statute unconstitutional.

### 7. Death Aggravator as Double Jeopardy

■ The defendant contends that his rights under the double jeopardy clauses of both the Fifth Amendment to the United States Constitution and Article 1, Section 14 of the Indiana Constitution [7] were violated by allowing the State to support its death penalty request by utilizing the greater offense of robbery as an aggravating circumstance after he had been prosecuted and convicted of the lesser included offense of theft based on the same conduct. This claim rests upon the premise that the sentencing phase of a single prosecution constitutes a successive prosecution for purposes of the Double Jeopardy Clause. Conceding that the theft conviction and sentence may be vacated as a lesser included offense in violation of the prong of the double jeopardy rule barring multiple punishments for the same offense, the State maintains that the guilt phase and the penal-

ty phase together make a single proceeding rather than a successive prosecution.

This question was recently answered in the negative by the United States Supreme Court in *Schiro v. Farley* (1994), —— U.S. ——, 114 S.Ct. 783, 790, 127 L.Ed.2d 47, 57. As in *Schiro*, neither the prohibition against a successive trial on the issue of guilt nor the prohibition against a second capital sentencing proceeding is implicated here. This is simply a single sentencing hearing in the course of a single prosecution. "The State is entitled to 'one fair opportunity' to prosecute a defendant, and that opportunity extends not only to prosecution at the guilt phase, but also to present evidence at an ensuing sentencing proceeding." *Schiro*, —— U.S. at ——, 114 S.Ct. at 790, 127 L.Ed.2d at 57 (citation omitted). We therefore find that it is improper to impose multiple punishments upon the defendant for the same conduct in the form of the sentence imposed for the theft charged in Count IV and the death penalty based upon the robbery aggravator. The appropriate remedy is that the conviction and sentence for the lesser offense of theft be vacated. *Woods*, 547 N.E.2d at 795. Because the capital sentencing phase was an integral component of a single prosecution, however, the death penalty proceeding against the defendant did not constitute a separate subsequent prosecution for the same conduct, in violation of the Double Jeopardy Clause.

### 8. Penalty Phase Instructions

The defendant claims reversible error in the trial court's giving and refusal to give various penalty phase instructions.

### a. Mitigator Burden of Proof Instruction

■ The defendant contends that the trial court erred in giving the following instruction to the jury in the sentencing phase:

> To find that a mitigating fact or circumstance exists, it must be proved by a preponderance of the evidence. It need not

---

**7.** The defendant does not argue that the state Double Jeopardy Provision provides any additional protection or requires different analysis than does its federal counterpart. Because the

defendant has presented no claim of independent state double jeopardy protection, this claim is waived. *See* footnote 1, *supra*.

be proven beyond a reasonable doubt. To establish by a preponderance of the evidence means that something is more likely true than not. In other words, a preponderance of evidence in this case means such evidence, when considered and compared with that opposed to it, has more convincing force, and produces in your minds a belief that what is sought to be proved is more likely true than not true.

Record at 3932.

The defendant contends that his rights to due process of law, a fair fact finding, and a fair weighing process were denied by instructing the jury that he had the burden of proving the existence of mitigating circumstances by a preponderance of the evidence. He argues that this instruction raises a substantial possibility that the jury's death recommendation was unreliable, as certain facts which might call for a sentence less than death, but which were not established by a preponderance, were excluded from the weighing process.

The defendant further argues that this instruction is misleading and confusing when read and considered with another instruction in which the court informed the jury that the defendant "is not required to prove his innocence, to present evidence of mitigating factors, or to prove or explain anything." Record at 3925.

■ Contrary to the defendant's argument that the questioned instruction implicitly placed a burden of proof upon him, the instruction in fact reduced his burden of proof and clarified for the jury that the defendant was not required to prove mitigating circumstances beyond a reasonable doubt. A jury should not be misled into thinking that it must accept any alleged mitigating circumstances even if supported by only a scintilla of evidence. *Lowery v. State* (1989), Ind., 547 N.E.2d 1046, 1056, *cert. denied,* (1990), 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176. The instruction correctly identifies the standard of proof for mitigating circumstances to be the preponderance of evidence standard. *Rouster v. State* (1992), Ind., 600 N.E.2d 1342, 1348.

We also disagree with the defendant's assertion that the instruction was misleading and confusing in combination with other instructions. It is not inconsistent to inform the jury that the defendant is not required to prove his innocence, to present evidence of mitigating factors, or to prove or explain anything, while at the same time informing the jury of the standard of proof required for mitigating circumstances to warrant consideration in the weighing process. We find no error in the giving of this instruction.

### b. Tendered Instruction No. 10

■ The defendant's tendered Final Instruction No. 10, which he alleges to be a correct statement of the law, reads:

A decision to grant Gerald Wayne Bivins mercy does not violate the law. The law does not forbid you from being influenced by pity for Gerald Wayne Bivins and you may be governed by mere sentiment and sympathy for Gerald Wayne Bivins in arriving at a proper penalty in this case.

You need not find the existence of any mitigating fact or circumstance in order to return a recommendation against death.

Record at 338. Citing *Eddings,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, and *Lockett,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, the defendant argues that the sentencer cannot be precluded from considering as a mitigating factor any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

In its refusal of the tendered instruction, the trial court was not *precluding* the jury from considering this type of potentially mitigating evidence; it merely declined to *invite* the jury to consider this evidence as mitigating. As noted in footnote 5, *supra,* the trial court expressly instructed the jurors that "[i]f ... you feel that the death penalty should not be given to the defendant herein for any reason, you may elect not to." Record at 3933. Furthermore, the trial court was following our precedent in so doing. This Court has on two recent occasions rejected appeals surrounding the refusal to give this exact or similar instruction. *Woods,*

547 N.E.2d at 785; *Canaan v. State* (1989), Ind., 541 N.E.2d 894, 910–11, *cert. denied,* (1990), 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 185.

#### c. Tendered Instruction No. 3

■ The defendant next claims the trial court erred by refusing an instruction which would have told the jurors that to impose a death sentence, they must be "convinced beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating circumstances." Record at 331. This is an incorrect statement of law. *Baird,* 604 N.E.2d at 1183; *Fleenor,* 514 N.E.2d at 91. We decline to reconsider our position on this point.

#### d. Tendered Instruction No. 4

■ The defendant's tendered Final Instruction No. 4 states:

The burden of proof in this case rests on prosecution from the beginning to the end of this proceeding to establish beyond a reasonable doubt every fact essential to prove death is the required punishment. Gerald Wayne Bivins has no burden to sustain. It is enough that his evidence, if when taken with the prosecution's, raises a reasonable doubt as to the recommendation of death.

Record at 332. Conceding that the trial court's other instructions informed the jury that the burden was on the State to prove the aggravating circumstance beyond a reasonable doubt and that the defendant was not required to prove or explain anything, including his innocence, the defendant nevertheless claims trial court error for refusing to instruct that the jury "could find a reasonable doubt from all the evidence, both the State's and the defendant's." Brief of Appellant at 65.

This tendered instruction was not only redundant, but also ambiguous and confusing. Its final sentence, containing the phrase "It is enough," is potentially unclear and confusing and may also imply that the State must prove that aggravation outweighs mitigation beyond a reasonable doubt, a proposition rejected in *Fleenor,* 514 N.E.2d at 92. The court did not err in rejecting this instruction.

#### e. Tendered Instruction No. 9

■ The defendant next contends that the trial court erred in refusing to give his Tendered Instruction No. 9, which would have informed the jury as follows:

The law presumes Gerald Wayne Bivins innocent of the aggravating circumstance and the law, consequently, presumes that the appropriate sentence for murder is a punishment other than death.

Record at 337. He argues that the appropriate punishment for murder is always punishment other than death unless and until the State has proven the existence of at least one aggravating circumstance and that there is a resulting presumption that a defendant is innocent of the charged aggravating circumstances.

While the death penalty statute requires the State to prove the existence of an aggravating circumstance beyond a reasonable doubt, the statute does not create a presumption of innocence regarding charged aggravating circumstances. The defendant presents no compelling authority recognizing such a presumption, and we are aware of none. Because this tendered instruction was not a correct statement of law, the trial court did not err in refusing it.

#### f. Tendered Instruction No. 11

■ The defendant claims trial court error in refusing his Tendered Instruction No. 11, which included a sentence informing the jury, "You may not consider any fact as a reason for choosing to recommend the death sentence unless you are satisfied beyond a reasonable doubt and to a moral certainty that that fact is true." Record at 339. Satisfaction "to moral certainty" is not required by Indiana's capital sentencing procedure, and this instruction has previously been disapproved. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 95, *cert. denied,* (1986), 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349. The United States Supreme Court, noting that the phrase "moral certainty" is potentially ambiguous in the abstract and that its common meaning continues to undergo change, recently observed that it does not condone or

countenance the use of the phrase. *Victor v. Nebraska* (1994) —— U.S. ——, 114 S.Ct. 1239, 1247–48, 127 L.Ed.2d 583, 596–97.[8] The trial court did not err in refusing this instruction.

We reject the defendant's claims of trial court error as to the penalty phase instructions.

### 9. Failure to Find and Weigh Mitigators

The defendant argues that his sentence of death was arbitrarily and capriciously imposed because the trial court failed to find and weigh mitigating circumstances which he claims are fairly supported by the record. Specifically, the defendant argues that the court ignored uncontradicted evidence that: (1) he was drinking heavily on the night of the murder, (2) his problems with the law began when he started using alcohol and drugs as a teenager following the suicide of his grandfather, (3) he was an alcoholic, and (4) another participant in the crime, Chambers, was the instigator. The defendant argues that even if his use of alcohol the night of the crime did not substantially impair his capacity to appreciate the criminality of his conduct as required by Indiana Code Section 35–50–2–9(c)(6), it and the other purported mitigators must be considered and given mitigating weight under 35–50–2–9(c)(8). He requests that this case be remanded so that the trial court may properly consider and weigh all of his allegedly relevant mitigating circumstances against the sole charged aggravator and resentence him appropriately.

A trial court is under no duty to deem mitigating every factor so alleged by the defendant simply because it is supported by some evidence in the record. Furthermore,

> [w]hen a defendant argues mitigating circumstances to the trial court, the sentencing judge is not obligated to explain why he has chosen not to make a finding of mitigation. This is particularly true when

an examination of the underlying record shows the highly disputable nature of the mitigating factors. Moreover, the trial court is not obligated to credit or weigh the defendant's evidence of mitigating circumstances the same way the defendant does.

*Hammons v. State* (1986), Ind., 493 N.E.2d 1250, 1254–55 (citations omitted), *reh'g denied,* 496 N.E.2d 1284; *accord Stout v. State* (1988), Ind., 528 N.E.2d 476, *post-conviction relief granted on other grounds* (1991), Ind. App., 580 N.E.2d 676. However, the failure of the trial court to find mitigating circumstances which are clearly supported by the record may reasonably give rise to a belief that they were overlooked and hence not properly considered. *Hammons,* 493 N.E.2d at 1255.

In its sentencing statement, the trial court expressly found that there were no mitigating circumstances warranting consideration. Supplemental Record at 55. Further explanation of the Court's finding the existence of no mitigating circumstances is found in oral statements made at the time of sentencing, when the trial judge stated that no mitigating circumstances existed and explained:

> The intoxication, the consumption of beer that was in evidence that occurred on the night in question, the Court does not find to any significant degree at all impaired Mr. Bivins' ability to think, to know what he was doing, to act, and cannot rise to the level of an excuse or mitigating factor to be considered by the Court.

Record at 3974.[9] The trial court did not otherwise discuss the defendant's claimed alcoholism, troubled adolescence, or the role of the accomplice, Chambers.

We do not find the claimed mitigating circumstances so clearly supported by the record as to lead to the conclusion that they were overlooked and not properly considered. The evidence did show that the

---

8. The Supreme Court, however, did not find the inclusion of the moral certainty phrase to render an instruction unconstitutional when viewed in context, as a whole with other instructions. *Victor,* —— U.S. at ——, 114 S.Ct. at 1248, 127 L.Ed.2d at 597.

9. It is preferable for the trial court to have specifically included its discussion of mitigating evidence in its formal written sentencing order. *See Hill v. State* (1986), Ind., 499 N.E.2d 1103, 1110.

defendant and his two companions purchased beer and consumed an unspecified quantity, leading the defendant's wife to describe her husband as "pretty well buzzed." Record at 2762. However, the companions explained that the defendant had no trouble driving. Record at 3393. They also believed that he was limiting his alcoholic intake to avoid the possibility of being stopped by police. Record at 3393. Because the evidence was in conflict regarding the degree of the defendant's intoxication, we find no error in the trial court's failure to find and consider this to be a mitigating circumstance.

■■■ There was testimony during the sentencing phase from the defendant's brother and mother that the defendant began drinking and using drugs at age fourteen, shortly after his alcoholic grandfather committed suicide. Six months before the commission of the murder, the defendant was arrested for driving while intoxicated, public intoxication, and driving with a blood alcohol content of .10 percent or above. He was convicted of the latter offense and sentenced to probation, which was terminated because of his failure to comply with alcohol treatment. He was arrested again for public intoxication three months later. The defendant contends that, despite the absence of expert testimony of diagnosed alcoholism, the evidence supported such a potential determination by the trial court. The evidence of alcoholism and troubled youth, although arguably adequate to permit a discretionary finding of relevance as mitigating circumstances, were not so clearly supported by the record as to lead us to conclude that they were overlooked and hence not properly considered by the trial court.

■■■ The defendant also claims trial court error in its failure to find a mitigating factor in the role of his companion, Chambers, as the alleged instigator of the robbery of Reverend Radcliffe. We find no evidence, however, that Chambers participated in, encouraged, or suggested the murder. There is no showing that the defendant was a relatively

minor accomplice or that he acted under the substantial domination of another person. Ind.Code § 35–50–2–9(c)(4), (5). The trial court did not err in failing to consider Chambers's role a mitigating circumstance.

Discharging our appellate review function with respect to the trial court's finding that no mitigating circumstances warranted consideration, we do not find error.

### 10. Use of Non–Statutory Aggravators, Including Victim Impact Evidence

■■■ The defendant contends that because of the role of non-charged [10] and non-statutory aggravating circumstances, including victim impact evidence, his death sentence violated the eighth and fourteenth amendments of the United States Constitution and Article 1, Section 16 of the Indiana Constitution.

In seeking the death penalty under Indiana law, the State must allege and prove beyond a reasonable doubt the existence of at least one aggravating circumstance. Ind. Code § 35–50–2–9(a). Subsection (b) of the same statute states that "[t]he aggravating circumstances are as follows," then enumerating specific aggravating circumstances. The death penalty may be ordered only if the aggravating circumstance or circumstances outweigh any mitigating circumstances. Ind. Code § 35–50–2–9(e). In the case of a capital sentence, the trial court must provide a statement of its reasons for the sentence selection. Ind.Code Ann. § 35–38–1–3 (West 1992); *Judy v. State* (1981), 275 Ind. 145, 167, 416 N.E.2d 95, 108. This statement should also articulate that the court evaluated and balanced the mitigating circumstances against the aggravating circumstances. *See Hammons*, 493 N.E.2d at 1254.

The State's request for the death penalty was based upon one capital statutory aggravator, the intentional killing during the commission of robbery. Ind.Code § 35–50–2–9(b)(1)(G). During the evidence presented in the penalty phase of the defendant's trial, the

---

**10.** Because of our resolution of the issue of aggravating circumstances not expressly designated in the death penalty statute, it is unnecessary to discuss the defendant's claim that the trial court

weighed certain factors that were neither charged nor designated as statutory death aggravators.

State asked the victim's wife to describe the impact the murder had on her and her son. Over the defendant's timely and continuing objection, her testimony was permitted. Following deliberation at the conclusion of the penalty phase evidence, the jury recommended that the death penalty be imposed. Thereafter, following a subsequent sentencing hearing, the trial court entered judgment and sentences on the conviction, ordered the death sentence imposed, and issued the requisite sentencing statement.

In its written sentencing order the trial court presented a comprehensive articulation of its finding and weighing of aggravating and mitigating circumstances for purposes of both felony sentencing and determination of the death penalty. The trial court did not separate its findings as to the death penalty from those relating to the sentences to be imposed for the non-capital felony counts. The written findings note the defendant's substantial prior criminal history record; the failure of previous attempts at probation and incarceration to deter the defendant's behavior, demonstrating a great risk that he would commit future crimes if permitted; his lack of regret or remorse; the fact that the defendant was on parole when the offenses occurred; and the observation that consideration of a reduced or suspended sentence would depreciate the seriousness of the offenses. The sentencing statement stated that "all the foregoing aggravating circumstances apply to the murder charge as well." Supplemental Record at 55.

Previous cases have explored the permissible range of aggravating circumstances that may be considered by the trial court in a death penalty determination. In *Davis v. State* (1985), Ind., 477 N.E.2d 889, *cert. denied*, 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475, we approved the trial court's finding and weighing of a non-charged statutory death penalty aggravator, commission of another murder, in addition to two charged and proven death sentence aggravating circumstances. We subsequently affirmed a death sentence in which the trial court not only found a capital statutory aggravator, killing while committing rape and robbery, but also expressly found and weighed other aggravating factors from the general felony sentencing statute, Indiana Code Section 35–38–1–7.1. *Minnick v. State* (1989), Ind., 544 N.E.2d 471. Distinguishing *Davis* and *Minnick*, this Court in *Bellmore v. State* (1992), Ind., 602 N.E.2d 111, reversed a death sentence resulting from a trial court's express consideration of an aggravating circumstance not among the specifically defined aggravating circumstances authorized either for death sentences or for general felony sentencing. We observed in *Bellmore* that our decision in *Minnick* was subsequently confronted by two recent U.S. Supreme Court decisions which held that in states like Indiana which require the sentencer to weigh the statutory aggravating factors against the mitigating factors, there is Eighth Amendment error when the sentencer weighs an invalid aggravating circumstance in deciding to impose death. *Sochor v. Florida* (1992), 504 U.S. 527, ——, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326; *Stringer v. Black* (1992), 503 U.S. 222, ——, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367.

The defendant has argued that, unlike *Bellmore*, his case presents the exact issue addressed by *Sochor* and *Stringer*. If so, at issue would be the remaining validity of *Minnick* in light of the *Sochor* and *Stringer* pronouncements that a weighing state cannot allow the consideration of invalid aggravators. Eighth Amendment violations have often been found for the weighing of aggravating circumstances which are invalid by reason of vagueness. *Espinosa v. Florida* (1992), —— U.S. ——, ——, 112 S.Ct. 2926, 2928, 120 L.Ed.2d 854, 858 (invalidating "especially wicked, evil, atrocious, or cruel" instruction); *Sochor* (1992), 504 U.S. 527, 112 S.Ct. 2114, 2123, 119 L.Ed.2d 326, 342 (invalidating "coldness" aggravator); *Stringer v. Black* (1992), 503 U.S. 222, ——, 112 S.Ct. 1130, 1134, 117 L.Ed.2d 367, 375 (invalidating "especially heinous, atrocious, or cruel" aggravator). These cases focus upon vagueness, not upon whether the aggravators used were among those prescribed by the applicable death penalty statute; they therefore do not appear to suggest that non-statutory aggravating circumstances are necessarily invalid. To the contrary, once statutory aggravating circumstances have circumscribed the

class of persons eligible for the death penalty, the federal Constitution does not require the sentencer to ignore other possible aggravating circumstances to the extent authorized in a state's capital sentencing statute. *Zant v. Stephens* (1983), 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 250–51. We therefore conclude that the trial court's consideration of non-statutory aggravating circumstances did not constitute a violation of the Eighth Amendment.

■ However, this does not conclude our inquiry. Federal death penalty jurisprudence is derived from the Eighth Amendment prohibition against the infliction of cruel and unusual punishments. Article 1, Section 16 of the Indiana Constitution provides similar but more extensive protection:

> Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense.

This provision has been independently enforced and recognized as going beyond the protection contained in the Eighth Amendment. *Conner v. State* (1993), Ind., 626 N.E.2d 803, 806; *Best v. State* (1991), Ind., 566 N.E.2d 1027, 1031; *Mills v. State* (1987), Ind., 512 N.E.2d 846, 848; *Taylor v. State* (1987), Ind., 511 N.E.2d 1036, 1039.

The consideration and weighing of aggravating circumstances to select which persons shall receive the death sentence essentially constitutes a determination of whether the death penalty is proportionate to the nature of the offense, including the character of the offender. Because of the ultimate gravity of the punishment, Indiana's death sentence procedure must be cautiously restrained to assure maximum compliance with the proportionality concerns of Article 1, Section 16 of our state constitution. When a trial court in death sentencing evaluation considers the more general statutory criteria that authorize enhancing non-capital sentences,[11] we perceive a serious risk that the resulting aggravating circumstances, when weighed against mitigating circumstances, will present a significant possibility of disproportionate sentencing not sufficiently related to the specific aggravating circumstances designated by our legislature as appropriate for the death sentence.

■ We therefore conclude that the application of our state constitution justifies a new rule of criminal procedure for capital sentencing. When the death sentence is sought, courts must henceforth limit the aggravating circumstances eligible for consideration to those specified in the death penalty statute, Indiana Code Section 35–50–2–9(b).

---

11. At the time of the defendant's sentencing, these included:

(1) The person has recently violated the conditions of any probation, parole, or pardon granted him.
(2) The person has a history of criminal or delinquent activity.
(3) The person is in need of correctional or rehabilitative treatment that can best be provided by his commitment to a penal facility.
(4) Imposition of a reduced sentence or suspension of the sentence and imposition of probation would depreciate the seriousness of the crime.
(5) The victim of the crime was less than twelve (12) years of age or at least sixty-five (65) years of age.
(6) The victim of the crime was mentally or physically infirm.
(7) The person committed a forcible felony while wearing a garment designed to resist the penetration of a bullet.
(8) The person committed a sex crime listed in Subsection (e) and

(A) the crime created an epidemiologically demonstrated risk of transmission of human immunodeficiency virus (HIV) and involved the sex organ of one (1) person and the mouth, anus, or sex organ of another person;
(B) the person had knowledge that the person was a carrier of HIV; and
(C) the person had received risk counselling as described in subsection (g).
(9) The person committed an offense related to controlled substances listed in subsection (f) if:
(A) the offense involved:
i) the delivery by a person to another person; or
ii) the use by any person on another person; of a contaminated sharp (as defined in I.C. 16–1–9.7–1) or other paraphernalia that creates an epidemiologically demonstrated risk of transmission of HIV by involving percutaneous contact;
(B) the person had knowledge that the person was a carrier of the human immunodeficiency virus; and
(C) the person had received risk counselling as described in subsection (g).
Ind.Code Anno. § 35–38–1–7.1 (West 1992).

This application is not inconsistent with the express language of the statute. The statutory list of *mitigating* circumstances expressly includes "[a]ny other circumstances appropriate for consideration," Ind.Code § 35–50–2–9(c)(8), but there is no analogous "open-ended" statutory authorization for the consideration of non-listed *aggravating* circumstances in the determination of a death sentence. Ind.Code § 35–50–2–9(b). In contrast to the capital sentencing provisions, the general felony sentencing statute's enumerated aggravating factors "do not limit the matters that the court may consider in determining the sentence." Ind.Code § 35–38–1–7.1(d). The death penalty statute further authorizes imposition of the death penalty only if the trial court finds proof beyond a reasonable doubt "that at least one (1) of *the* aggravating circumstances exists," and that "*any* mitigating circumstances that exist are outweighed by *the* aggravating circumstance or circumstances." Ind.Code § 35–50–2–9(g) (emphasis added). The specific use of the definite article "the" to identify authorized aggravating circumstances, in contrast to the broader use of "any" before "mitigating circumstances," implies legislative intent to limit consideration to statutorily specified aggravating circumstances.

The new rule adopted today is not based upon statutory construction but rather emerges from state constitutional considerations. As a newly declared constitutional rule regarding the conduct of criminal proceedings, it is applicable to all cases pending on direct review. *Davis v. State,* (1992), Ind., 598 N.E.2d 1041, 1051. *See also Coleman,* 558 N.E.2d at 1061; *Wilson v. State* (1987), Ind., 514 N.E.2d 282, 284. As a matter of state procedural law, however, this new constitutional rule will not be applicable on collateral review to cases which have become final, including those on direct appeal,

before the rule was announced.[12] *Daniels v. State* (1990), Ind., 561 N.E.2d 487, 489. Since the present case is before us on direct review, the new rule applies and renders invalid the trial court's weighing of aggravating circumstances not designated in the capital sentencing statute.

With respect to the victim impact evidence issue, the defendant argues that such evidence violates Indiana's constitutional proportionality requirement by permitting the sentencing decision to rest on vindication and sympathy for the victim's survivors and that it is not relevant to prove any of the aggravating circumstances set out in the death penalty statute. He also urges that it is statutorily excluded in death penalty cases under Indiana Code Sections 35–38–1–8.5(a) and 35–38–1–9(b)(3) and (c)(4).[13] The State argues, in part, that the victim impact evidence in this case was relatively insignificant, comprising less than one full transcript page.

The Eighth Amendment is not violated if a state chooses a procedure permitting the admission of victim impact evidence and allowing prosecutorial argument whereby the death sentence decision includes consideration of evidence concerning the victim and the impact of the murder on the victim's family. *Payne v. Tennessee* (1991), 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736. Concurring, Justice O'Connor emphasized that the Court was not thereby holding "that victim impact evidence must be admitted, or even that it should be admitted." *Id.* at 831, 111 S.Ct. at 2612, 115 L.Ed.2d at 739 (O'Connor, J., concurring).

However, for such evidence to be admissible, it must be relevant to an issue properly before the jury or court. *Woods v. State* (1990), Ind., 557 N.E.2d 1325, 1326, *cert. denied,* (1991), 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (opinion on rehearing).

12. Today's new constitutional rule of criminal procedure does not fall within either of the two narrow exceptions to the non-retroactivity of new rules on collateral review. The rule does not place "certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe," *Daniels,* 561 N.E.2d at 490, nor does it constitute a "watershed rule" necessary to the fundamental fairness of a criminal proceeding or alter our understanding of the "bedrock procedural elements essen-

tial to the fairness of the proceeding." *Id.* at 490.

13. Indiana Code Sections 35–38–1–8.5 and –9 generally provide for the inclusion of a victim impact statement in a probation officer's presentence investigation. The subsections cited by the defendant expressly exempt cases where the death sentence is sought.

With our determination today that Indiana's statutory death penalty aggravators are the only aggravating circumstances available, the admissibility of the victim impact evidence in the present case hinges upon its relevance to the death penalty statute's aggravating and mitigating circumstances.

In the present case, the victim impact evidence consisted of Mrs. Radcliffe's testimony that her husband "was always there" for their son and that on the night of the murder, Rev. Radcliffe would have been at their son's basketball game but for the need to make a hospital visit. Record at 3875. She also testified that with the loss of her husband, she had "lost his companionship and his love, his protection and his care, as well as his friendship and his income, because, you see, I can't go to work: I am disabled." *Id.* The victim impact evidence comprised twelve lines in the trial transcript. The State did not refer to this testimony in its arguments to the jury. The court's instructions to the jury identified only the charged aggravating circumstance and further advised:

> The aggravating circumstance which was read to you is the only aggravating circumstance that you may consider. You are not allowed to take into account any . . . other facts or circumstances as a basis for deciding that the death penalty would be an appropriate punishment in this case.

Record at 3931.

■ While the victim impact evidence here is improper because of its lack of relevance to the charged aggravating circumstances, the significance of such evidence to the ensuing jury recommendation is exceedingly doubtful. Juxtaposed against the strong evidence of the charged aggravating circumstance, and considering the trial court's limiting instruction and the fact that the victim impact evidence was not emphasized in the State's argument to the jury, it is clear that the limited victim impact evidence did not contribute to the jury's death recommendation. We find the admission of such evidence to be harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

However, having determined that a death penalty decision must be based exclusively upon the statutorily enumerated capital sentencing aggravating circumstances and that this new Indiana constitutional rule of criminal procedure is applicable to the present direct appeal, and because the trial court's sentencing statement alludes to both statutory and non-statutory capital sentence aggravators, we must determine the resulting consequences in the case before us.

### 11. Nature of Relief to Be Afforded

■ Where we find an irregularity in a trial court's decision to impose the death sentence, this Court has various options, as correctly noted by the defendant. Among these are: 1) to remand to the trial court for a clarification or new sentencing determination; 2) to affirm the death sentence if the constitutional error is harmless beyond a reasonable doubt; and 3) to reweigh the proper aggravating and mitigating circumstances independently at the appellate level. *Bellmore*, 602 N.E.2d at 129–30. Notwithstanding the defendant's preference for remand and resentencing, we find a sentence of death to be appropriate on each and either of the latter two grounds, harmless error and independent appellate reweighing.

■ Significant to our harmless error conclusion is the fact that the trial judge found no mitigating circumstances warranting consideration in the weighing process. While the trial court referred to aggravating circumstances in addition to the charged statutory aggravating circumstance, it expressly found the charged aggravator to be clearly proven beyond a reasonable doubt. However, because the statute provides that the court "may" impose a death sentence, the proof of the charged aggravating circumstance does not necessarily compel the death sentence.

In determining to what extent, if any, the trial judge's consideration of general felony aggravators influenced his death sentence, we are aided by considering both the formal sentencing statement and the trial judge's oral comments at the final sentencing. The formal written sentencing statement identi-

fies the charged statutory aggravating circumstance as crucial to the judgment:

> The court further finds all the foregoing [general felony sentencing] aggravating circumstances apply to the murder charge as well. Also the aggravating factor found by the jury is hereby affirmed by the court, that is, the murder was committed in the course of a robbery from the victim. The court specifically finds that even though that particular robbery was not charged, and defendant was not convicted of that robbery, yet the evidence is clear that in the course of conduct in which the defendant was engaged he had taken property belonging to the victim, to-wit: his billfold from his person by threatening the use of force while armed with a deadly weapon whereupon the victim was executed by the defendant. The court finds that the evidence produced at trial clearly proved beyond a reasonable doubt that the murder was committed in the course of the commission of a robbery. The jury so found and the court does now affirm that finding.

Supplemental Record at 60. Further insight into the trial judge's reasoning is found in his oral statement at the time of sentencing. After discussing each of the other charged offenses, the court separately discussed the murder count:

> The evidence at trial was clear that a robbery occurred, and that as part of that robbery Mr. Radcliffe was killed. The evidence was clear that the killing was done in a cold-blooded manner; that there was no indication of any heat or passion; there was no indication of any kind that Mr. Radcliffe in any way did any act, made any statement or comment or otherwise encouraged or asked for or incited the killing. Further there is evidence, and the court believes to be the case, that Mr. Bivins wanted to commit a murder because he wanted to know what it felt like. He wanted to know what it was like to kill somebody. From the evidence it appears that but for the grace of God Mr. Hritzkowin would have been killed at the Holiday Inn, and that Mr. Bivins that evening in question was a man on a mission, and it

was just a matter of God's will and the luck of the draw as to who would be the victim.

Record at 3973–74. The trial judge mentioned no other aggravating circumstances in his oral explanation of the sentence.

The formal sentencing statement reflects a full consideration of potential mitigating circumstances and an unequivocal conclusion by the trial court:

> The court again finds no mitigating circumstances in considering the penalty to be imposed for that murder. There are no circumstances which offset or reduce the seriousness of the offense or the aggravation of the offense. There are simply no mitigating circumstances to take into account given defendant's situation, circumstances and the course of conduct in committing the offenses including the murder.

Supplemental Record at 60.

Evaluating the evidence before the trial court, the jury's recommendation favoring imposition of the death penalty, and the trial judge's written and oral findings, we are decisively convinced that the defendant would have been sentenced to death even without the inclusion of evidence of non-statutory aggravating circumstances. We conclude that any consideration of non-statutory death aggravating circumstances was harmless beyond a reasonable doubt.

As a separate and independent basis for our decision that the death sentence is appropriate, we have also independently evaluated and weighed the evidence of the charged aggravating circumstance as well as the evidence showing possible mitigating circumstances.

 The charged aggravating circumstance was the intentional killing during the commission of a robbery. The evidence is clear that the defendant and his companion confronted the victim in a public restroom and announced a robbery with their weapons drawn. The victim immediately relinquished his wallet, whereupon the defendant pushed the victim into a stall and shot him in the head. The defendant thereafter told his companions that he shot the victim because he wanted to know what it felt like to kill. Record at 3680. The defendant also later

told his companion Weyls that he had done the killing "because he could identify him." Record at 3383. Whether the killing was calculated to avoid identification or to experience the sensation of killing, it was nonetheless clearly intentional. We find the charged aggravating circumstance to have been proven beyond a reasonable doubt.

The evidence raises the possibility of mitigating circumstances appropriate for consideration. As previously noted in Part 9 of this opinion, there was evidence that the defendant used alcohol on the evening of the murder, that he may have had a troubled childhood, and that he had been afflicted with alcoholism. However, the extent of the defendant's intoxication at the time of the murder is unclear. He had no trouble driving, and his companions believed that he was consuming very little alcohol "in case we got stopped." Record at 3393. His disclosure immediately following the murder that he committed the act to know what it felt like to kill is strongly probative evidence of the defendant's awareness of his conduct. We find that the defendant's use of alcohol on the night of the crime did not substantially impair his ability to appreciate the criminality of his conduct. Ind.Code § 35–50–2–9(c)(6). Nor do we find that his lesser degree of intoxication warrants mitigating weight under Indiana Code Section 35–50–2–9(c)(8). We do find that the defendant's possible alcoholism, combined with his behavior problems beginning as a teenager shortly after the suicide death of his alcoholic grandfather, is appropriate for mitigating consideration under Indiana Code Section 35–50–2–9(c)(8). In our judgment, however, this mitigating circumstance is not substantial and warrants only slight weight.

The defendant also urges that mitigating weight be given to the fact that the robbery of Reverend Radcliffe was instigated by his accomplice, Chambers, who pointed out the size of Reverend Radcliffe's wallet and stated: "Let's get this guy." Record at 3375–76. *See also* Record at 3676. Considering the defendant's conduct thereafter, as well as his conduct during the evening, we do not find the defendant to have been a relatively minor accomplice or that he acted "under the sub-stantial domination of another person" when he committed the murder. Ind.Code § 35–50–2–9(c)(4), (5). We find no other circumstances shown by the record to warrant mitigating consideration.

■ We must now weigh the alcoholism/troubled adolescence mitigating circumstances against the defendant's intentional killing in the course of a robbery. Balancing the relatively low level of the mitigating circumstances against the proven substantial and serious aggravating circumstance, we are compelled to conclude that, pursuant to Indiana Code Section 35–50–2–9, the proper and appropriate sentence for defendant Gerald W. Bivins is the death penalty. We further find this sentence to be proportionate not only to the nature of the offense and the character of the defendant, but also to the sentences approved for capital murder defendants in other Indiana cases. *See, e.g., James v. State* (1993), Ind., 613 N.E.2d 15; *Jackson v. State* (1992), Ind., 597 N.E.2d 950, *cert. denied,* (1993) — U.S. ——, 113 S.Ct. 1424, 122 L.Ed.2d 793; *Games,* 535 N.E.2d 530; *Huffman v. State* (1989), Ind., 543 N.E.2d 360, *cert. denied,* (1990) 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 767; *Martinez–Chavez v. State* (1989), Ind., 534 N.E.2d 731; *Rondon v. State* (1989), Ind., 534 N.E.2d 719, *cert. denied,* 493 U.S. 969, 110 S.Ct. 418, 107 L.Ed.2d 383; *Underwood v. State* (1989), Ind., 535 N.E.2d 507, *cert. denied,* (1989), 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206; *Woods,* 547 N.E.2d 772; *Van Cleave v. State* (1987), Ind., 517 N.E.2d 356, *cert. denied,* (1989), 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808; *Burris v. State* (1984), Ind., 465 N.E.2d 171, *cert. denied* (1985), 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809; *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900; and *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, *cert. denied,* (1982), 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384.

*Conclusion*

This cause is remanded to the trial court for revision of judgment, to merge the conviction for Count IV, charging theft of money and bank card, with that for Count I, charg-

ing robbery, and to vacate the separate sentence for Count IV accordingly. In all other respects, the judgment of the trial court and the sentences, including the death sentence, are affirmed. Further proceedings shall be in accordance with Indiana Criminal Rule 24(G).

DeBRULER and GIVAN, JJ., concur.

SHEPARD, C.J., concurs in all but part 10, in separate opinion.

SULLIVAN, J., concurs in result, in separate opinion.

SHEPARD, Chief Justice, concurring in all but part 10.

Justice Dickson's opinion is a superb piece of work, and I join in just about all of it, as I join in the disposition.

I part company, however, on the declaration that the Indiana Bill of Rights prohibits Reverend Radcliff's widow from saying a few words about the impact of Bivins' crime. I think Mrs. Radcliff's testimony was altogether pertinent to the decision Judge Milligan was about to make, and I think we ought to interpret the Indiana Constitution in a way which gives Mrs. Radcliff and others like her the chance to be heard.

I expect that the people of Indiana will be amazed to learn that Justices of their Supreme Court have declared victims constitutionally irrelevant in death penalty cases.

SULLIVAN, Justice, concurring in part and concurring in result.

I concur in the result of the majority's opinion and its analysis of all issues except three aspects of part 10 concerning the use of non-statutory aggravating circumstances and victim impact evidence.

First, the majority concludes that to permit the trial court to consider non-statutory aggravating circumstances violates Article 1, § 16 of the Indiana Constitution because it could result in disproportionate sentencing. I do not reach the constitutional issue because I believe that consideration of non-statutory aggravating circumstances is pro-

hibited by our death penalty statute itself. My view of this issue is the same as expressed by Justice DeBruler in *Minnick v. State:*

> Indiana's *statutory* system for giving death requires the sentencer to balance the weight of aggravating circumstances enumerated in the death statute against any mitigating circumstances. This is our death sentence procedure and it does not permit the sentencer to consider aggravating circumstances other than those enumerated in the death sentence statute when engaged in the weighing process.

*Minnick v. State* (1989), 544 N.E.2d 471, 483, *reh'g denied* (DeBruler, J., concurring and dissenting) (emphasis supplied).

Second, the majority discusses at some length the retroactive application of its rule on the use of non-statutory aggravating circumstances to future cases under both direct and collateral review. This case is a direct appeal and I see no reason to render an advisory opinion on retroactivity issues.

Third, I agree with the majority that the admissibility of victim impact evidence during the penalty phase of a capital trial depends upon its relevance to the statutory aggravating circumstances and to the mitigating circumstances before the court. As the majority's analysis shows, this frequently will result in such evidence being inadmissible during the penalty phase. The proper time to present victim impact evidence is during the sentencing hearing before the trial court, after the jury has made its recommendation. At that hearing, the trial court is required to offer the victim's representative, if present, an opportunity to make a statement concerning the crime and the sentence. Ind.Code §§ 35–38–1–8(b) and 12(a) (1993).[1]

---

**1.** I reject Appellant's contention that the legisla-

ture meant to exclude victim impact evidence in

capital cases by the language in Indiana Code §§ 35–38–1–8.5 and 9 (1993). These provisions relieve a probation department in capital cases of its normal obligations to notify victims of scheduled sentencing hearings and their right to make or submit a statement and to include a victim impact statement in the presentence report. However, these statutes do not prohibit a probation department from giving such notice or including such a statement, nor do they modify the obligation of the trial court to permit a victim's representative present at sentencing to make a statement concerning the crime and the sentence. Ind.Code §§ 35–38–1–8(b) and 12(a).