

FILED

Mar 24 2016, 9:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy J. O'Connor
O'Connor & Auersch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Alexander Dupree, <br> *Appellant-Defendant,* <br><br> *v.* <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 24, 2016 <br><br> Court of Appeals Case No. <br> 49A02-1505-CR-439 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Lisa F. Borges, Judge <br><br> Trial Court Cause No. 49G04-1311-FA-70773 |

**Bradford, Judge.**

## Case Summary

[1] On October 29, 2013, Appellant-Defendant Alexander Dupree and five accomplices (collectively, "the Defendants"), after variously using marijuana and cocaine and drinking alcohol since the prior evening, entered the Indianapolis home of C.P., his wife E.P., and their daughter A.P. ("the House"). Once inside, the Defendants proceeded to ransack the House in

search of valuable items to steal, frequently threatening to shoot or kill C.P., E.P., and A.P. One of the Defendants drove with E.P. so that she could withdraw money from her bank, and he forced her to fellate him in the vehicle. Back at the House, Dupree forced A.P. to fellate him before he and three other Defendants vaginally raped her. At one point, C.P., who is unable to walk without the use of leg braces and a cane, was beaten with a drawer. One of the Defendants forced A.P. to drive to the bank so that she could withdraw cash, and then the Defendants left, taking C.P.'s, E.P.'s and A.P.'s vehicles with them. The ordeal lasted approximately two hours. Dupree was charged with thirty-five offenses, and, after a jury trial, was convicted and sentenced for eleven: Class A felony criminal deviate conduct, Class A felony attempted criminal deviate conduct, two counts of Class A felony rape, Class A felony burglary, Class A felony robbery, Class B felony robbery, Class C felony robbery, and three counts of Class B felony carjacking. The trial court imposed an aggregate sentence of 248 years of incarceration.

[2] Dupree contends that (1) his convictions for Class B felony robbery of A.P. and three counts of carjacking violate Indiana's single larceny rule, (2) his convictions for Class A felony robbery and Class A felony Burglary violate prohibitions against double jeopardy because they were both enhanced by the same bodily injury, and (3) his 248-year sentence is inappropriate. While we disagree with Dupree's first and third contentions, his second is meritorious. Consequently, we affirm in part, reverse in part, and remand with instructions

to reduce Dupree's Class A felony robbery conviction to a Class B felony and reduce his aggregate sentence to 218 years of incarceration.

# Facts and Procedural History

[3] During the evening of October 28, 2013, Dupree, Trae Spells, Michael Pugh, Adrian Anthony, and Demetre Brown were "hanging out" at an apartment near the intersection of 38th and Meridian Streets in Indianapolis. Tr. p. 968. At the apartment, the group was "chilling, smoking, and drinking." Tr. p. 970. Spells indicated that he personally smoked marijuana and "Spice[.]" Tr. p. 970. Eventually, the five left in a car that Pugh had borrowed. The group first drove to a liquor store and obtained some peach vodka, which was then consumed. Next, the group obtained some powdered cocaine, of which all five partook.

[4] The group drove to another residence where "people were hanging out" and, after going in and having a "good time[,]" left with a sixth person, Isaiah Hill. Tr. p. 978. Eventually, the Defendants stopped at the House, located on 79th Street in Indianapolis. The Defendants walked into the garage, which had been left open the night before. Brown and Anthony were armed with .38 caliber handguns. All six of the Defendants donned gloves, and Pugh opened the door into the House, which had been left unlocked. Once inside, all Defendants went upstairs and happened to first enter C.P. and E.P.'s bedroom, Anthony brandishing a handgun and leading the way.

[5] C.P. and E.P. were awakened by loud voices at 5:15 a.m. The voices instructed C.P. and E.P. to get up and were demanding cash, cellular telephones, and

guns. C.P and E.P were also told not to look up and that, if they did, they would be killed. C.P. suffers from a neurological condition that requires him to use leg braces and a cane to walk. When C.P. stated that he needed to put his leg braces on, he was told to remain in bed while E.P. got up.

[6] Meanwhile, A.P. awoke in the next bedroom when she heard screaming. A.P. brought her purse to her parents' bedroom and gave it to the first Defendant she encountered. At some point later in the morning, one of the Defendants came into C.P.'s bedroom demanding the keys to the Ford Explorer in the garage. Although C.P. answered, the reply was not heard, and the Defendant beat C.P. over the head with a nightstand drawer.

[7] Spells was told to take A.P. back to her bedroom, and, at about the same time, E.P. attempted to run to an office down the hallway and dial 911. Anthony shot E.P. in the hip as she ran and she did not make it to the telephone. When Spells asked Anthony why he had shot E.P., Anthony replied, "Shut up little Bro. It's what you gotta do." Tr. p. 997. Spells and Brown took A.P. back to her bedroom and made her lie face down on her bed. At one point, one of the Defendants began to touch the back of A.P.'s leg, moved up to one of the leg openings in A.P.'s sleep shorts, and touched her vagina on the outside. Somebody asked A.P. if she had any money, and she replied that she had $9000.00 in her bank account. This generated great excitement, and A.P. was taken downstairs.

[8] By this time, Hill had helped E.P. downstairs. Once downstairs, some of the Defendants were discussing taking E.P. to an ATM and going through sets of keys, asking her which set went with her vehicle, a Ford Escape. The keys to the Escape were identified around the time that E.P. became aware that A.P. had also been brought downstairs by Spells and placed in a room adjacent to the kitchen. E.P. walked out into the garage with Anthony and attempted to run to the next-door neighbor's house, but tripped and fell and was tackled by Anthony. Anthony dragged E.P. back into the kitchen and shot her again, this time in the foot. When asked by another of the Defendants why he had shot E.P., Anthony explained that it had been because she ran. One of the Defendants then kicked E.P. in the head, causing her to "really [see] stars." Tr. p. 97. E.P. decided at this point that she was just going to do whatever the Defendants told her to.

[9] Anthony pulled E.P. into the back seat of the Escape, and as Hill drove, E.P. gave directions to her bank at 91st and Meridian Streets. After a while, Anthony showed E.P. the ATM card they wished to use, and she noticed that it was A.P.'s, the pin code to which she did not know. Hill turned the Escape around to return to the House. On the way back, Anthony pulled down E.P.'s sweat pants and his own and unsuccessfully attempted to anally penetrate her from behind. After a short time, Anthony said, "This isn't working. Let's try it a different way." Tr. p. 107. Anthony turned E.P. around, forced her head down, and forced her to fellate him. Anthony ejaculated in E.P.'s mouth and told E.P., "You better swallow or I'll kill you." Tr. p. 110. E.P. did, and

Anthony looked into her mouth and wiped it out with "a sleeve or some piece of material." Tr. p. 110.

[10] Once back at the House, Hill went in and retrieved another ATM card, this time C.P.'s. Anthony had taken E.P. around to the driver's seat and he sat in the front passenger seat. E.P. backed out and, as they drove, Anthony held a gun on her. When Anthony and E.P. arrived at the ATM, E.P. withdrew $800.00 and gave it to Anthony. Anthony told E.P. to tell "the other guys" that they had only withdrawn $500.00. Tr. p. 119. After an unsuccessful attempt to withdraw more money, the duo returned to the House.

[11] While E.P. was being taken to withdraw money, A.P. was in the room next to the kitchen and was told by Spells that she was going to be shot if she opened her eyes. Hill, after returning from the first trip to the bank with Anthony and E.P., grabbed A.P. by the hair and took her into an adjacent bathroom. Hill sat on the toilet while Dupree sat on the sink counter. Dupree said, "I'm gonna get head from this … girl." Tr. p. 191. Dupree pushed A.P.'s head down, caused her to fellate him, and said, "If you bit[e] me, I'll shoot you." Tr. p. 198. At the same time, Hill was attempting to have vaginal intercourse with A.P. from behind, but was unable to achieve full penetration. After a while, Hill led A.P. through a second door in the bathroom into a den.

[12] Once in the den, Hill led A.P. to a couch where he vaginally penetrated her and told her to "moan bitch[.]" Tr. p. 204. After Hill finished, Dupree unsuccessfully attempted to anally penetrate A.P. as she stood with her back to

him and her hands on the couch. Dupree did manage to vaginally penetrate A.P. with his penis. When Dupree was finished, Brown moved A.P. to the floor and vaginally penetrated her with his penis. While Brown was raping A.P., Spells left and told Pugh that "they down there having sex with her[.]" Tr. p. 1026. Pugh told Spells to watch C.P., but Spells returned downstairs when it appeared that C.P. could not move. Spells arrived back in the den as Brown was finishing his rape of A.P. Brown told Spells several times, "Bro, get some Bro[,]" and Spells raped A.P. as well. Tr. p. 1028. Spells vaginally penetrated A.P. and ejaculated inside of her. Spells left A.P. on the den floor.

[13] Meanwhile, Anthony had returned with E.P. from the second trip to the bank and left her on the living room floor by the front door. Anthony left with A.P. and the duo got into the Escape, with A.P. driving. Anthony was pointing a handgun at A.P. At first, A.P.'s debit card could not be located, but it was found in the yard, and Anthony and A.P. left. A.P., who by this time was wearing nothing but a t-shirt, felt her bare feet sticking in her mother's blood on the floor of the Escape. As A.P. was withdrawing $800.00 from the ATM, Anthony touched her vagina on the outside. According to surveillance video, the withdrawal occurred at 7:02 a.m. Meanwhile, at around 6:50 a.m., a neighbor observed three vehicles leave from the victims' driveway, with Brown and Dupree leaving last in A.P.'s black Mitsubishi Spyder. Once Anthony and A.P. returned to the House, they entered through the front door and found E.P. sitting at the foot of the stairs. Anthony told A.P. and E.P. to go upstairs, and they did. By this time, only Spells and Anthony remained at the House. Spells

left in a stolen Infinity sedan and Anthony left in the Ford Escape. Spells soon abandoned the Infinity, transferred stolen items to the Escape, and left with Anthony.

[14] After a few minutes, A.P. looked outside and was unable to see any of her family's vehicles or any of the Defendants. A.P. noticed the lights on at a neighbor's house, ran over, and summoned help. The ordeal had lasted approximately two hours, with police arriving at approximately 7:30 a.m. The House had been thoroughly ransacked, with all of the televisions and computers and several pieces of jewelry loaded into the victims' vehicles as the morning progressed. E.P. and A.P. were transferred to the hospital for treatment. E.P.'s injuries required her to be wheelchair-bound before wearing a boot and using a cane for an extended period.

[15] All of the Defendants rendezvoused later, transferred the stolen goods to the shed behind Dupree's mother's house, and immediately began to sell various items. The Ford Escape and Mitsubishi Spyder were abandoned at a church one-and-a-half blocks from Dupree's residence, and the Infinity was also quickly found. After a police investigation, all six Defendants were identified as suspects.

[16] By August of 2014, all six Defendants had been charged with thirty-five counts, ranging from Class A felonies to misdemeanors: fourteen counts of criminal deviate conduct, four counts of rape, three counts of robbery, three counts of carjacking, three counts of criminal confinement, two counts of intimidation,

one count of aggravated battery, one count of battery by bodily waste, three counts of battery, and one count of burglary.

[17] A jury trial was held over six days in March of 2015, with Spells testifying for the State and Dupree, Anthony, Pugh, and Brown being tried together. Following the presentation of evidence, the State dismissed seven of the charges against the Defendants, leaving twenty-eight to be submitted to the jury. The jury acquitted Dupree of five counts and found him guilty of twenty-three offenses: four counts of Class A felony rape, two counts of Class A felony criminal deviate conduct, two counts of Class A felony attempted criminal deviate conduct, two counts of Class B felony robbery, three counts of Class B felony carjacking, three counts of Class B felony criminal confinement, two counts of Class C felony intimidation, Class B felony aggravated battery, Class A felony robbery, two counts of Class A misdemeanor battery, and Class A felony burglary.

[18] On May 1, 2015, the trial court held a sentencing hearing, at which it vacated or reduced various convictions on double jeopardy grounds. The trial court entered judgment of conviction and sentenced Dupree for a total of eleven charges:

- Fifty years for Count V, Class A felony criminal deviate conduct
- Fifty years for Count XI, Class A felony attempted criminal deviate conduct
- Fifty years for Count III, Class A felony rape
- Fifty years for Count IX, Class A felony rape

- Fifty years for Count XXXV, Class A felony burglary
- Fifty years for Count XVIII, Class A felony robbery
- Twenty years for Count XIII, Class B felony robbery
- Eight years for Count XXXIII, Class C felony robbery
- Twenty years each for Counts XIV, XXVII, and XXXII, Class B felony carjacking

[19] The trial court ordered that the following sentences be served concurrently: Counts III and V (rape and criminal deviate conduct on A.P); Counts IX and XI (rape and attempted criminal deviate conduct on A.P.); and Counts XIV, XXVII, and XXXIII (carjacking). The trial court ordered that all remaining sentences were to be served consecutively, for an aggregate sentence of 248 years of incarceration. The trial court found Dupree's criminal history, history of substance abuse, and violation of the conditions of probation to be aggravating circumstances. The trial court also found the nature of the offenses to be "unbelievably aggravating" and an "extreme aggravator." Tr. pp. 1429, 1430. The trial court also noted C.P.'s infirmity, which was known to Defendants, and that the victims were "not just attacked, not just burglarized or robbed, but humiliated, literally humiliated, and treated as if they were nothing." Tr. p. 1429.

[20] Dupree argues that (1) his convictions for Class B felony robbery and three counts of Class B felony carjacking violate the single larceny rule, (2) the use of the same injury to enhance his Class A felony burglary and Class A felony robbery convictions violate prohibitions against double jeopardy, and (3) his aggregate 248-year sentence is inappropriately harsh. The State counters that (1) the single larceny rule does not apply to Dupree's convictions, (2) any

violation of the prohibitions against double jeopardy would be cured by reducing Dupree's Class A felony robbery to a Class B felony, and (3) Dupree's sentence is appropriate.

# Discussion and Decision

## I. Single Larceny Rule

[21] Dupree contends that his convictions for Class B felony robbery and three counts of Class B felony carjacking violate Indiana's single larceny rule.

> The Single Larceny Rule has long been entrenched in Indiana law as evident by the following passage in *Furnace v. State* (1899), 153 Ind. 93, 95, 54 N.E. 441, 44:
>
> > We recognize no good reason to depart from what may be considered the great current of authority and hold the pleading in question bad when it can reasonably be said that it discloses that the larceny complained of was but one single act or transaction in violation of the law against larceny, although the property which was the subject of the crime belonged to several different persons. The particular ownership, as charged in the pleading, of the money stolen did not give character to the act of stealing, but was merely a part of the description of the particular crime charged to have been committed. The information, *prima facie*, under the circumstances, can be said to charge but one offense against the State, and is not open to the objection that it is bad for duplicity.
>
> The prevailing rule is that when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons there is but a single "larceny", i.e. a single offense. *Stout v. State* (1985), Ind., 479 N.E.2d 563; *Holt v. State* (1978), 178 Ind. App. 631, 383 N.E.2d 467. The rationale behind this rule is that the taking of several articles at

the same time from the same place is pursuant to a single intent and design. *Holt, supra.* If only one offense is committed, there may be but one judgment and one sentence.

*Raines v. State*, 514 N.E.2d 298, 300 (Ind. 1987).

[22] The charges at issue read as follows, first a Class B felony robbery charge involving A.P. and one Class B felony carjacking charge each against E.P., A.P., and C.P.:

> COUNT XIII
>
> DEMETRE BROWN, ADRIAN ANTHONY, ALEXANDER DUPREE, MICHAEL PUGH, TRAE T. SPELLS AND ISAIAH HILL, AKA ZEKE HILL, on or about October 29, [2013, did knowingly, while armed with a deadly weapon, that is: a handgun, take from] the person or presence of [A.P.] property, that is: currency, and/or computer, and/or jewelry, and/or keys, and/or television, and/or cellular phone, by putting [A.P.] in fear or by using or threatening the use of force on [A.P.];
>
> * * * *
>
> COUNT XIV [Class B felony carjacking]
>
> DEMETRE BROWN, ADRIAN ANTHONY, ALEXANDER DUPREE, MICHAEL PUGH, TRAE T. SPELLS AND ISAIAH HILL, AKA ZEKE HILL, on or about October 29, 2013, did knowingly take from the person or presence of [A.P.] a motor vehicle, that is: a Mitsubishi convertible, by putting [A.P.] in fear or by using or threatening the use of force on [A.P.];
>
> * * * *
>
> COUNT XXVII [Class B felony carjacking]
>
> DEMETRE BROWN, ADRIAN ANTHONY, ALEXANDER DUPREE, MICHAEL PUGH, TRAE T. SPELLS AND ISAIAH HILL, AKA ZEKE HILL, on or

about October 29, 2013, did knowingly take from the person or presence of [E.P.] a motor vehicle, that is: a Ford Escape, by putting [E.P.] in fear or by using or threatening the use of force on [E.P.];

* * * *

COUNT XXXII [Class B felony carjacking]

DEMETRE BROWN, ADRIAN ANTHONY, ALEXANDER DUPREE, MICHAEL PUGH, TRAE T. SPELLS AND ISAIAH HILL, AKA ZEKE HILL, on or about October 29, 2013, did knowingly take from the person or presence of [C.P.] a motor vehicle, that is: an Infinity sedan, by putting [C.P.] in fear or by using or threatening the use of force on [C.P.]

Appellant's App. pp. 135-36, 141, 143.

[23] As an initial matter, we have little trouble concluding that the single larceny rule does not apply among the three carjacking charges. The evidence at trial established that Dupree, along with his accomplices, collectively stole A.P.'s Mitsubishi Spyder, E.P.'s Ford Escape, and C.P.'s Infinity. The Indiana Supreme Court has squarely held that the single larceny rule "does not apply to the situation … where a robber has taken the individual property of separate individuals." *Ferguson v. State*, 273 Ind. 468, 475, 405 N.E.2d 902, 906 (1980), *see also Curtis v. State*, 42 N.E.3d 529, 536 (Ind. Ct. App. 2015) (where defendant "first robbed Shweiki, in her capacity as an employee of CVS, of property belonging to the pharmacy, *i.e.*, the Opana pills [and] then robbed Williams of her personal property, *i.e.*, her car keys" that defendant's actions did not constitute a single act of robbery), *trans. denied*.

[24] What remains to be discussed are Dupree's convictions for robbing A.P. of various personal property and then stealing her car. At the very least, the robbery of A.P. of currency, accomplished by compelling her, at gunpoint, to drive to an ATM and withdraw money, occurred at neither the same place nor the same time as the taking of her vehicle. This case cannot be meaningfully distinguished from the Indiana Supreme Court's holding in *Bivens v. State*, 642 N.E.2d 928 (Ind. 1994). In *Bivens*, the defendant, *inter alia*, pointed a gun at a victim in a motel room and took his cash, credit card, and van keys, which was parked in the lot of the motel. *Id*. at 935. Bivens argued that his convictions for the thefts of personal property and the van should be merged pursuant to the single larceny rule. *Id*. at 944. The Indiana Supreme Court rejected this argument on the basis that the two thefts did not occur in the same place, writing, "We decline to deem the [motel] parking lot to be a part of [the victim's] motel room." *Id*. at 945. As the Indiana Supreme Court did in *Bivens*, we decline to conclude that the ATM where the money was taken from A.P. is the same place as the House, from where her vehicle was taken. We conclude that the single larceny rule does not require the vacation of any of Dupree's convictions.[1]

---

[1] Because we conclude that the single larceny rule does not apply due to the multiplicity of victims and/or locations, we need not address the State's alternate argument that the rule does not apply as between the robbery and carjacking convictions because they are defined by different statutes. *See, e.g.*, *J.R. v. State*, 982 N.E.2d 1037, 1040 (Ind. Ct. App. 2013) ("We conclude that the crimes of theft and auto theft are distinct offenses, and J.R.'s true findings for both offenses did not violate the single larceny rule."), *trans. denied*.

## II.  Double Jeopardy

[25] Dupree contends, and the State concedes, that the same serious bodily injury, *i.e.*, the two gunshot wounds suffered by E.P., was improperly used to enhance both a burglary conviction and a robbery conviction to Class A felonies.  *See, e.g.*, *Smith v. State*, 872 N.E.2d 169, 177 (Ind. Ct. App. 2007)  ("[I]f the same bodily injury was used to enhance Smith's conviction of burglary to a Class A felony as was used to enhance his conviction of robbery to a Class A felony, entering a judgment of conviction for both counts would be improper."), *trans. denied*.  Moreover, the parties agree that a proper remedy is to reduce Dupree's Class A felony robbery conviction to a Class B felony, with a corresponding reduction in Dupree's sentence.  Consequently, we order the reduction of Dupree's conviction under Count XVIII for Class A felony robbery to a Class B felony and the reduction of his sentence for that charge from fifty years of incarceration to twenty.[2]

## III.  Appropriateness of Sentence

[26] Dupree contends that his aggregate sentence, reduced to 218 years due to our disposition of Issue II, is inappropriately harsh.  We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense

---

[2]  Because the trial court imposed maximum sentences for all of Dupree's eleven convictions, we are confident it would do the same for Count XVIII, even though it has been reduced to a Class B felony.

and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "The defendant has the burden of persuading us that his sentence is inappropriate." *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008).

[27] The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State,* 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id*. Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. *Id.* at 1224. The trial court imposed Dupree's sentence, which is now 218 years, following his convictions for Class A felony criminal deviate conduct, Class A felony attempted criminal deviate conduct, two counts of Class A felony rape, Class A felony burglary, two counts of Class B felony robbery, Class C felony robbery, and three counts of Class B felony carjacking.

[28]    Dupree concedes the heinous nature of the offenses committed by him and the other Defendants, and it is fair to say that Dupree was highly culpable. Over the course of two hours, Dupree and the other Defendants terrorized an entire family, ransacking their home and taking anything of value they found that was not tied down, including three vehicles. Dupree drove the Defendants to the House, personally stole the Mitsubishi Spyder, and hid stolen articles at his residence. Far worse than the property crimes were the atrocities committed against the family members. All three were repeatedly threatened with death, C.P. was beaten with a nightstand drawer, E.P. was shot twice and kicked in the head, and A.P. and E.P. were forced at gunpoint to withdraw money from their bank accounts.

[29]    Finally, E.P. and A.P. were sexually violated in a manner that can only be called appalling. E.P. was forced to fellate Anthony to ejaculation after he unsuccessfully attempted to anally penetrate her. A.P. was first violated while in her bed, when one of the Defendants reached up her sleep shorts to fondle her vagina. Dupree was directly involved in the worst of it. After A.P. was brought downstairs, Dupree forced her to fellate him while Hill attempted to rape her from behind. Dupree told A.P. that if she bit his penis, he would shoot her. A.P. was then taken into the next room where she was vaginally raped by four of the Defendants in turn, with Dupree going second after unsuccessfully attempting to anally penetrate her. As if that were not enough, Anthony fondled A.P.'s vagina as she withdrew money from her bank account, which she was being forced to do at gunpoint. The nature of the offenses committed

by Dupree and the other Defendants is among the most heinous we have encountered, fully justifying extremely long sentences for all of the Defendants, including the 218-year sentence given to Dupree.

[30] Dupree's character also justifies his lengthy sentence. Dupree, twenty-three at the time of the instant offenses, had a violent and related criminal history. In 2010, Dupree was convicted of two counts of Class B felony robbery and two counts of Class B felony criminal confinement after forcing two victims to drive to a bank while he was armed with a handgun. In 2013, Dupree was charged with methamphetamine and marijuana possession. Dupree was in re-entry court for the 2010 convictions and on bond for the 2013 charges when he committed the present offenses. Defendant's long history of illegal substance abuse also reflects poorly on his character. Dupree began drinking at a young age, smoked marijuana daily, ingested cocaine at least once a week, and abused prescription drugs and Spice. Dupree has been offered treatment, even "successfully" completing one program in 2012, to no apparent avail.

[31] Although Dupree expressed remorse for his crimes, the record indicates that he has not fully taken responsibility for them. Dupree denied participation in the rape of A.P. Dupree indicated that the he and the other Defendants decided to commit the instant offenses for money but that "stuff just got out of hand." Appellant's App. p. 363. Dupree indicated that his judgment on that morning had been clouded by his voluntary alcohol and drug intoxication, and that he did what he did because he was "'high'" and "'in the moment'" with his "'adrenaline pumping.'" Appellant's App. p. 363. An evaluation pursuant to

the Indiana Risk Assessment System indicated that Dupree was in the "VERY HIGH risk category to reoffend." Appellant's App. p. 364. Dupree's character also justifies his lengthy sentence.

[32] Dupree compares his case to *Corbally v. State*, 5 N.E.3d 463 (Ind. Ct. App. 2014), in which the defendant's 270-year sentence was determined to be inappropriate. *Id*. at 471. To the extent that comparing the facts in two different cases, each with unique facts, is ever useful, such a comparison does not help Dupree here. Although *Corbally* involved multiple sexual offenses, they were all committed by one person against one victim. *Id*. at 466-67. Here, a total of six Defendants terrorized three victims for two hours, including numerous sexual assaults committed by five of the Defendants against mother and daughter. The facts of this case are not anywhere close enough to those in *Corbally* to justify applying its reasoning here.

## Conclusion

[33] We conclude that the single larceny rule does not require the vacation of any of Dupree's convictions. However, we agree with Dupree, as does the State, that prohibitions against double jeopardy require the reduction of his Class A felony robbery conviction to a Class B felony, with a corresponding reduction of his sentence for that offense from fifty to twenty years. Finally, we conclude that Dupree's 218-year aggregate sentence is appropriate in light of the nature of his offenses and his character.

[34] We affirm the judgment of the trial court in part, reverse in part, and remand with instructions to reduce Dupree's Class A felony robbery conviction to a Class B felony and reduce his aggregate sentence to 218 years of incarceration.

Baker, J., and Pyle, J., concur.